**Elvin Esteves, Esq.**
**LAW OFFICE OF ELVIN ESTEVES LLC**
**460 Bloomfield Avenue, Suite 200**
**Montclair, NJ 07043**
**(862) 881-5552**
**elvin@estevesjuris.com**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Matthew Youngs, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>DraftKings, Inc.; Crown NJ Gaming Inc. d/b/a DraftKings, Resorts Atlantic City, and DGMB Casino LLC,<br><br>*Defendants*. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Matthew Youngs ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendants DraftKings, Inc., Crown NJ Gaming Inc. d/b/a DraftKings (collectively "DraftKings"), and DGMB Casino LLC. Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## **INTRODUCTION**

1.      In 2013, New Jersey became one of the first states in the nation to legalize internet gambling. Today, both New Jersey's internet casino industry and online sports betting industry are the largest in the nation in terms of dollars bet annually.

2.      Online betting allows consumers to use mobile apps on their smartphones to bet on casino games or sports anywhere in a state where it is legal, at any time.

3.      While the industry started off a little slow, the popularity of internet gambling

1

rapidly increased with the COVID-19 pandemic and has continued growing since.

      4.      Today it is a massive industry. The New Jersey Division of Gaming

Enforcement (DGE) said that internet gambling brough in over $214 million in revenue in

November 2024 alone.

      5.      Likewise, sports books in New Jersey, among which DraftKings is a leader,

brought in almost $4.5 billion in revenue in 2024.

      6.      Meanwhile, over the past few years, signs of gambling addictions in New Jersey

have skyrocketed.[1]

      7.      Online gambling is particularly dangerous for people developing and struggling

with gambling addiction. As one longtime industry participant put it, "America can survive

sports betting. It survived illegal betting for years. Whether it can survive a casino on

everyone's phone — that I can't answer. That might be the tipping point."[2]

      8.      DraftKings is the most dominant player in New Jersey's internet gambling

industry and has driven much of its growth over the past few years.

      9.      As of the end of November 2024, DGMB Casino LLC—through which

DraftKings operates its internet casino in New Jersey—reported that it had earned almost $550

million dollars so far this year.

      10.      Consumers can also use DraftKings' online casino from Connecticut, Michigan,

Pennsylvania, and West Virginia. DraftKings has the largest or one of the largest online casinos

in each of these states as well and is constantly lobbying more states to legalize online casino

---

[1] *Wayne Parry, New Jersey loves the money from online sports betting, but fears addictive consequences*, AP, Oct. 24, 2024, https://apnews.com/article/online-gambling-sports-betting-compulsive-new-jersey-20ab0e86ddae2327f47c7ff10bbd27cf (last visited Dec. 17, 2024).

[2] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

gambling.

11.     Plaintiffs bring this action because DraftKings is earning enormous amounts of revenue through misleading promotions and addicted users.

12.     DraftKings' business model has long involved pushing the boundaries of the law, misleading consumers, and luring naïve gamblers into developing addictions.

13.     DraftKings advertises an all-upside gambling experience, falsely promising new users that they will get free money which they can wager without any risk. In reality, DraftKings has created an all-upside opportunity only for itself: the contracts require new users to deposit and gamble almost exclusively with their own money, which they almost always lose. DraftKings also engages in other undisclosed manipulations, forcing those users who are able to initially win to make worse and worse bets until their funds are exhausted.

14.     DraftKings uses these tactics to identify and cultivate the people it wants on its platform: those who are susceptible to these sorts of advertisements and most likely to lose a lot of money sports betting. In other words, marks.

15.     As a direct result of these promotions, many customers have gambled and lost more money than they intended as a result of these deceptive and unfair promotions, and some customers have developed gambling addictions and lost thousands or—like Plaintiff Youngs— even hundreds of thousands of dollars.

16.     One of DraftKings' deceptive practices is a promotion that promises new users that if they sign up, their first bet would be at no risk to them ("Risk-Free Bet" or "No Sweat First Bet").

17.     These purportedly no-risk bets, however, were not as advertised. The promotion requires that the customer deposit funds and place the bet with their own money.  If a customer

loses their bet, they are not returned to their original position. Instead, their accounts are credited with an expiring "Bonus Bet" rather than the amount the user initially wagered in U.S. dollars.

18.    Receiving "Bonus Bets" when the original bet loses does not make the original bet "Risk-Free" as advertised. "Bonus Bets" cannot be withdrawn for cash. Instead, they must be both wagered and won before they have any cash value.

19.    Furthermore, wagers made with Bonus Bets are not paid out like wagers made with U.S. dollars. A winning $100 bet made with U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of ~9%, which results in a payment of approximately $191. By contrast, a winning bet made with a $100 Bonus Bet converts only to $100 US dollars less vig, which results in a payment of approximately $91.

20.    Thus, the new customer responding to the no-risk advertisement can get their money back only if they win their second bet, which is not risk free, and even then, with the vig subtracted.

21.    The Bonus Bet is thus worth significantly less than the initial bet, meaning that the money the customers was induced to deposit was never in fact risk-free as advertised.

22.    DraftKings further engages in deceptive practices through its near-ubiquitous advertisements that offer to match a new user's first deposit up to $1,000. This promotion, too, is misleading and inaccurate.

23.    In order to receive the promised matching amount, users have to deposit up to 5x the matching amount and then bet up to 25x the matching amount on long-shot bets that users have low odds of winning, all within a relatively short period of time. Even then, and even if

they win, customers do not actually receive a cash match of their deposit as the promotion implies. Instead, they receive "DK Dollars" equal to their deposit amount. Like "Bonus Bets," "DK Dollars" are not redeemable for cash and must be wagered and won before they have any value.

24.     DraftKings's newest and perhaps most deceptive scheme is its Casino Deposit Match Promotion, in which users are tricked into opting into a deposit match promotion with nearly-impossible-to-satisfy terms. These terms, written in opaque language, also give DraftKings the ability to take all of a user's money should they begin but fail to complete the promotion.

25.     DraftKings advertisements for the Casino Deposit Match Promotion use large print and clear language to promise users free money if they make a deposit and try out the online casino. In reality, this promotion ends up only one of two ways: users either lose their initial deposit because they are unable or unwilling to satisfy the unreasonable play-through requirements that are only revealed to users after they have begun the promotion, or they make far more bets than they initially intended and risk developing a dangerous gambling addiction.

26.     Rather than meeting user's reasonable expectation that they will be able to walk away with whatever portion of their initial deposit they did not lose on bets—as they can in the sportsbook promotion—DraftKings surprises users by taking their deposit because, they say, it has been transformed into "winnings associated with the promotion."

27.     DraftKings advertises an all-upside gambling experience, promising new users that they will get up to $2,000 in free money if they make a deposit on DraftKings and use it in the casino. In reality, DraftKings has created an all-upside opportunity only for itself.

28.     The hidden and confusing terms of DraftKings' Casino Deposit Match

Promotion regularly result in consumers accidentally forfeiting or losing all the money they deposited.

29.     Consumers are not losing their money because they gambled it away but because DraftKings treats them as having forfeited it—often a thousand dollars or more—just because they attempted to opt out of the deposit match promotion after realizing that in order to complete it, they will need to place tens of thousands of dollars in high-risk casino bets.

30.     When consumers ask DraftKings for their money back, they are rebuffed and told they should have more carefully parsed the long and confusing terms, that, as described below, are unclear even on close examination.

31.     Due to DraftKings' market dominance in a regulated industry, customers tend to trust that the company will comport itself fairly and run promotions that are fair.

32.     Additionally, consumers familiar with the way DraftKings' signup bonus promotions associated with its sportsbook work, assume that its casino promotion have terms that are similar to those they've seen in the past.

33.     Instead, DraftKings is tricking users into irrevocably committing themselves to make a Hobson's choice between gambling so much they are likely to develop an addiction— and lose a significant amount of money in the process—or walk away from all of the money they initially deposited.

34.     No user could reasonably expect this would happen to them, even if they carefully read the terms associated with this promotion.

35.     Moreover, often DraftKings is opting users into this promotion without them even realizing it, simply because they place a single bet in its online casino after making a deposit.

36.    Countless users have lost money through this confusing scheme. Many have reported it to the Better Business Bureau and the New Jersey DGE, but despite—or because—its knowledge of how many people are being deceived and inadvertently losing money, DraftKings continues on misleading customers.

## PARTIES

37.    Plaintiff Matthew Youngs is a resident of New Jersey residing in Little Falls. Plaintiff Youngs began using DraftKings for its daily fantasy sports in 2016 and has been using DraftKings for sports betting and online casino gambling since DraftKings opened those offerings in New Jersey.

38.    Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2023, DraftKings is a publicly traded company that trades on the Nasdaq Stock Exchange.

39.    Defendant Crown NJ Gaming Inc. is a privately held company incorporated in Delaware with its principal place of business in Boston, Massachusetts. Crown NJ Gaming Inc. is a subsidiary of DraftKings and is responsible for conducting some portion of DraftKings business in New Jersey.

40.    Defendant DGMB Casino LLC is a company incorporated in New Jersey with its headquarters and principal place of business in Atlantic City, New Jersey. DGMB Casino is the owner and operator of Resorts Atlantic City, which has licensed to DraftKings or its subsidiary Crown NJ Gaming Inc. the right to operate a digital casino under Resorts Atlantic City's "site" license within the state of New Jersey.

## JURISDICTION AND VENUE

41.     This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of

interest and costs, and this is a class action in which at least one member of the class is a citizen

of a different state than Defendants. The number of members of the proposed class in aggregate

exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

42.     This Court has personal jurisdiction over Defendants because theyregularly

conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or

derives substantial revenue from products and/or services provided to persons in this District.

43.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

Defendant does business in this District and because a substantial part of the events or

omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.  Online Gambling in New Jersey and DraftKings' dominant industry position

44.     In 2013, New Jersey became the first state to legalize and regulate online casino

gambling under the Casino Control Act, paving the way for licensed operators to offer online

slots, table games, and other forms of digital casino wagering through mobile smartphone apps

in every corner of the state.

45.     New Jersey's gambling market is regulated by the New Jersey DGE, which

imposes rules and requirements to ensure fairness, transparency, and consumer protection.

46.     In 2018, New Jersey obtained a favorable ruling from the United States Supreme

Court in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), which

held that a federal law could not prohibit New Jersey and other states from legalizing sports

betting within their borders.

47.    As a result of this decision, the market for sports betting has exploded. The total US revenue of sportsbooks exploded from $430 million in 2018 to $10.92 billion in 2023.[3]

48.    More dollars were bet on sports in New Jersey in 2024 than in any other state in the nation.

49.    DraftKings has boasted in its annual reports with the SEC that it began operating in New Jersey only a few months after the Supreme Court struck down the Professional and Amateur Sports Protection Act, giving the company a head start in the nascent online sports betting market.

50.    Part of how DraftKings was able to capture a significant share of the online sports betting market from the moment it was legalized in New Jersey was by leveraging its brand recognition and success in daily fantasy sports—particularly with young men who bet money on daily fantasy sports contests in New Jersey long before the *Murphy* decision.

51.    Long before gambling was legalized, DraftKings offered "daily fantasy sports" contests to New Jersey consumers, including sometimes to those who were under the age of eighteen.

52.    In practice, "daily fantasy sports" is sports betting by another name. In these contests, users bet on the performance of athletes in sporting events, but in doing so they "compete" against each other rather than the sportsbook, which keeps a portion of the pot.

53.    Daily fantasy sports are very popular with adolescents, which gives DraftKings an important advantage in terms of brand recognition and a head start in turning young people

---

[3] Mike Reynolds, *American Gaming Association: Legal sports betting hits record revenue in 2023*, S&P GLOBAL, Feb. 21, 2024, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/american -gaming-association-legal-sports-betting-hits-record-revenue-in-2023-80522087 (last visited Nov. 27, 2024).

into reliable sports betters on its platform.[4]

54.    In the years before the recent wave of sports betting legalization, regulators across the country raised alarms around DraftKings' daily fantasy sports offering, its advertising, and its lax enforcement of age restrictions.

55.    DraftKings is perennially among the top online sportsbooks nationally in terms of annual revenue. In 2024, DraftKings was the second largest sportsbook by revenue in New Jersey.

56.    DraftKings reinvests a lot of its revenue in hooking more users on sports betting. DraftKings' sales and marketing expenses totaled $1.2 billion in 2023.[5] DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads showcased various promotions that DraftKings was running, typically targeting new users and promising bonuses and no-risk bets for signing up and making their first deposit.

57.    As DraftKings has repeatedly said in its annual 10–K reports, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts."

58.    DraftKings' target audience for these marketing efforts is new users and casual gamblers—those who are most likely to lose money and who might turn into high-value addictive gamblers losing thousands of dollars a month to DraftKings.

59.    In fact, DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets in its sports book, while naïve losing

---

[4] Michael Sekich, *Drawing the Line of Scrimmage: Global Perspective of Daily Fantasy Sports in the Advertising Space*, 12 PENN. ST. J.L. & INT. AFF. 178, 202 (2023).
[5] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%202020

consumers are targeted with more and more deceiving promotions and sometimes even VIP hosts to encourage their gambling more money with more frequency.

60.     DraftKings could set standardized bet limits for all its users, but instead it dynamically limits the maximum allowable bet for each individual user in order to maximize the amount more addictive gamblers lose to the company while minimizing the company's exposure to more successful bettors. The practice of dynamically limiting amounts to prevent bettors from winning too much is one more fact that DraftKings does not disclose in its promotions.

61.     DraftKings' CEO has admitted that the company is only interested in serving bettors who are likely to lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[6]

62.     DraftKings is not, however, following a traditional "entertainment" industry business model of trying to "entertain" as many customers as possible.

63.     Instead, DraftKings is seeking to exclude customers who are successful at betting while trapping those who are not. The latter customers, many of whom end up losing more than they can afford, are the source of most of DraftKings' revenues.

64.     DraftKings mines its user data to identify the most potentially-lucrative users— those with developing gambling addictions—and then intentionally targets them with personalized outreach to increase the amount and frequency of their wagering on DraftKings.

65.     As further described below, DraftKings designs its promotional offers to lure in and identify those users most likely to become consistent gamblers.

---

[6] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

66.     These promotional offers include promises to match users deposits and offers of "Risk-Free" (later termed "No Sweat") bets. But rather than coming through on the large-print offers made to new users in advertisements for these promotions, DraftKings contradicts the large-print offers by inserting difficult to read, legally-opaque fine print terms hidden behind hyperlinks that are only available when a user is about to opt-in to the promotions and, thereafter, by enforcing complicated rules that DraftKings knows will be overlooked and misunderstood.

67.     Not only do these false promises lure consumers into opening and funding accounts on DraftKings, but they also lure many users into wagering larger amounts and more frequently than they otherwise would.

68.     This was DraftKings' goal all along. DraftKings knows that the money it invests to sign up a customer often pays for itself many times over. According to McKinsey partner Dan Singer, "When a market opens up, you've got to get out there and start acquiring, because being the first book that someone downloads gives you roughly twice as much action as being the second or the third."[7]

69.     As the sports betting market in New Jersey became more saturated, DraftKings began turning its attention from recruiting new customers at any cost to retaining the most vulnerable customers it already has hooked on its platform.

70.     The customer retention stage is much more profitable for DraftKings than the initial customer acquisition stage.[8]

71.     Originally, DraftKings and other sportsbooks used to make good on the promises

---

[7] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST, Sept. 27, 2022, https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/ (last visited Nov. 15, 2024).
[8] *Online Sportsbook: A Shift In Player Retention?*, GAMING AMERICA, Mar. 17, 2023 https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention (last visited Nov. 15, 2024).

they made to new users of cash deposit matches and no-risk bets—where you get cash back if you lose. However, to do so, they hemorrhaged profit as they entered new markets.

72.     As the Washington Post has reported, "the days of companies giving away straightforward deposit matches worth thousands of dollars are largely over. Instead, sportsbooks are deploying increasingly complicated deals that advertise a big dollar figure but are far less generous [than advertised] upon closer examination."[9]

73.     Today, while DraftKings still makes the same bold promises in their ads, it now gives users "Bonus Bets" and "DK Dollars" that cannot be cashed out and must be used on the platform in accordance with complicated and unintuitive terms.

74.     In an online gambling marketplace saturated by sign-up promotions targeting vulnerable individuals with big "free" or "risk-free" dollar figures—some of which are truly risk-free and some of which, like those offered by DraftKings, are not—consumer confusion reigns. DraftKings exploits that confusion.

**B.  DraftKings' Pivot to Online Casino Gambling**

75.     Online casino gambling has also become a significant component of New Jersey's gaming industry, generating billions in revenue and attracting millions of consumers.

76.     In 2020, as in-person entertainment dropped during the COVID-19 pandemic and online gambling boomed, DraftKings added online casino gambling to its offerings in New Jersey.

77.     DraftKings sees online casino gambling as an important area for growth because it is more predictable and therefore profitable compared to handling sports betting, where the company faces the risk of uncontrolled outcomes and dynamic—and therefore error-prone—

---

[9] *Supra* note 7.

ods.[10]

78.     Driven by this business prerogative, DraftKings has established itself as the most dominant player in the nascent online casino betting market, which is bigger in New Jersey than any other state in the country.

79.     DraftKings has done so by leveraging its brand recognition and existing user base, as well as aggressive marketing, celebrity endorsements, and promotional offers.

80.     DraftKings often has the highest monthly market share of any online casino platform in New Jersey in terms of monthly revenue.[11]

81.     In Connecticut, Michigan, Pennsylvania, and West Virginia, the other states where DraftKings operates online casino gambling, it has a similarly dominant market position.

82.     For example, in September 2024, DraftKings' partner in Pennsylvania, Hollywood Casino at Penn National Race Course, reported a monthly gross revenue of over $66 million from online casino gaming, almost $20 million more than the closest competitor.[12]

83.     DraftKings' brand recognition and market position allows it to exert considerable influence over consumer expectations and industry practices in the online gambling ecosystem and to get away with practices that smaller, less-established operators could not.

84.     DraftKings' large userbase of online sports bettors can use the same funds they deposit to the app for sports betting to try out online casino gambling, and DraftKings often

---

[10] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

[11] *FanDuel and DraftKings Rule New Jersey's iGaming Market*, ODDSTRADER, May 21, 2024, https://www.oddstrader.com/news/fanduel-and-draftkings-rule-new-jerseys-igaming-market/ (last visited Dec. 17, 2024).

[12] *Gaming Control Board Reports September Revenue*, PENNSYLVANIA GAMING CONTROL BOARD, Oct. 14, 2024, https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/gaming-control-board-reports-september-revenue (last visited Dec. 17, 2024).

entices them to do so with appealing-sounding promotions.

85.     DraftKings also portrays itself as a fair, transparent, and consumer-friendly operator, encouraging users to participate in its promotions and deposit funds into its platform.

86.     These promotions often come with complex, opaque, and poorly disclosed terms and conditions, which are concealed from consumers until after they have made their deposits to the site.

### C. DraftKings' Casino Deposit Match Promotion

87.     Since at least 2022, DraftKings has offered a series of promotions that promise users to match a deposit they make into their online casino account. While the offers have varied monetarily, they all made materially similar promises with opaque and onerous requirements.

88.     These promotions have been titled "Casino Deposit Match" and are offered to both new and existing sportsbook users.

89.     DraftKings advertises the Casino Deposit Match Promotion on billboards and in digital media as well as directly to people engaged in sports betting on its own platform.

90.     These offers lure those familiar with DraftKings' sportsbook to try its online casino by promising to match 100% of a customer's deposit up to $2,000.

91.     The advertisements have eye-catching promises in large print of a massive cash bonus matching a deposit.



*Figure 1: example advertisement for the Casino Deposit Match Promotion promulgated on digital media in New Jersey.*

92.    Other advertisements for the promotion have tokens raining down and fireworks.



*Figure 2: Example advertisement for the Casino Deposit Match Promotion that would appear in a customer's social media feed.*

93.    Conspicuously missing from these advertisements is any mention of the terms

and conditions that will eventually lead most users to regret ever making a deposit.

94.     What the promotional materials fail to communicate is the true length to which a user must go in order to receive any tangible benefit from the promotion and the fact that a user's entire deposit will be forfeited should they choose to opt out or fail to meet the Herculean prerequisites.

95.     DraftKings' Casino Deposit Match Promotions are subject to egregious playthrough requirements, often set at 10x or 15x the combined amount of the deposit and bonus funds. Thus, to redeem a $2,000 bonus (a common DraftKings offer) at a 10x playthrough requirement, a user would need to wager at least $40,000 (10x playthrough of BOTH the $2,000 deposit and the $2,000 bonus).

96.     Additionally, these promotions have a seven-day window for users to satisfy the playthrough requirements.

97.     Accounting for this, a user would have to wager over $5,700 every day for a week in order to satisfy the $2,000 bonus playthrough requirement.

98.     DraftKings further manipulates the terms such that all wagers do not contribute equally to the playthrough requirement. In fact, casino games with the most favorable statistical returns to users, like table games, contributed to the playthrough requirements at rates significantly lower than other casino games where users have a much lower chance of winning, like slot machines. For example, blackjack, a game known for its close-to-even returns, counts at a rate of just 20% towards the playthrough requirement. In other words, if a user bet $100 on a hand of blackjack, only $20 would count towards their playthrough requirement. Meanwhile, the games that significantly favored the house, like slots, satisfied the playthrough requirement at rates of 100%.

99.     For a user to satisfy a $40,000 playthrough requirement playing just blackjack, they have to gamble a minimum of $200,000 in a seven-day timeframe.

100.    This means that, assuming a hand of blackjack takes ~1 minute, a user betting $50 every hand would have to spend more than 66 hours in a 7-day period playing blackjack to satisfy the playthrough requirement. That amounts to almost ten hours of blackjack a day, without stopping to eat or go to the bathroom.

101.    As described more below, the fact that users must spend a tremendous amount of time gambling in a short timespan is by design. DraftKings intends for customers to spend enough time engaging in habit-forming gambling behavior that they do, in fact, form a habit.

102.    DraftKings knew, or should have known, that its customers would not find or understand the proviso, hidden deep in the terms for the promotion, that casino games contributed to the playthrough requirement at varying rates and that the most favorable games contributed only marginally to the playthrough.

103.    The hard-to-understand terms and conditions further specify that "Order of Funds for wagering [are]: (1) customer's initial qualifying deposited funds (the Original Deposit) are wagered first prior to casino bonus funds, (2) winnings accrued during the play-through of the Original Deposit, (3) bonus amount." This provision appears to suggest that a user even has to play-through anything they have won beyond the amount of their initial deposit after first satisfying their initial deposit play-through requirement, but before they can satisfy the playthrough requirement for the bonus funds.

104.    Despite these terms providing that each pool of money will be treated differently, DraftKings shows only one number in a user's account: the total of their deposit, additional winnings, and bonus.

18

105.    The "order of funds for wagering" provision is paired with language that states, "Failure to complete the play-through requirement, defined below, of the Original Deposit and Casino Bonus Funds within seven (7) days (the "Play-through Period") of the Casino Bonus Funds being credited to your account will void the award. This will result in forfeiture of any wagered and lost portion of the Original Deposit, Casino Bonus Funds and any accumulated winnings."

106.    Apparently, DraftKings thinks this language establishes that, in the event a user fails to complete the playthrough within seven days or decides to opt out of the promotion after realizing it is impossible to satisfy, they stand to lose their entire original deposit and any money they have won wagering it—not just the promotion's bonus funds.

107.    In practice this means that, if a user deposited $2,000 and only wagered, say, $2,500 before deciding that they cannot satisfy the playthrough requirement, their account balance would be reset to $0 because DraftKings would treat their $2,000 deposit as gone, and the $2,500 in their account as "accumulated winnings" that are subject to forfeiture.

108.    DraftKings supplements the confusion by including in the terms, in bold, the statement that "**At any point, a customer may decide to forfeit their bonus and remove themselves from the promotion.**" But DraftKings fails to warn users that "forfeit[ing]" their bonus will not leave them any better off than just allowing the promotion to expire—or deleting the app and never returning—because once they bet their initial deposit, no matter how much money remains in their account, DraftKings treats all the funds as forfeitable if the playthrough is not met.

109.    A reasonable expectation, especially for gambling-naive users, is that failure to satisfy the requirements would result in a user's account being reset to the amount of their

initial deposit, plus or minus any gambling wins or losses, sacrificing only promotion

incentives. DraftKings users could not reasonably be expected to understand that their money

was to be wagered in a specific order and treated differently after being wagered, particularly

when their account balance reflected a single dollar amount and was not represented as separate

"pools" of money to be treated differently.

110.    This expectation is particularly reasonable because it is consistent with how

DraftKings' sportsbook deposit match promotions work. Under this promotion, often advertised

alongside the casino deposit match promotion, a user is progressively given bonus funds as they

satisfy the playthrough requirement and can opt out at any time.

111.    In many cases, customers who failed to satisfy the terms were shocked when

their account balance was reset to zero, forfeiting even their initial deposit. Numerous

individuals have reported this experience on Reddit and to the Better Business Bureau.

112.    Moreover, DraftKings is opting users into this promotion without them even

realizing or intending to have opted in.

113.    When users discover that they have locked up their money in the Casino Deposit

Match Promotion simply by placing a single bet in the casino, they are faced with either trying

to recoup it by gambling an enormous amount in a short period of time or walking away from

it.

114.    Indeed, some users have taken to social media to air their grievances with the

promotion. Several posts on Reddit discuss user confusion and frustration with the "Deposit

Match" promotions.

115.    One Reddit account posted a detailed description in December 2023 of his

experience with a "100% Casino Deposit Match".[13] After depositing $1,000 into DraftKings and playing hundreds of hands of blackjack, this user decided that the requirements were too onerous to complete, particularly given the negligible contribution of his blackjack playing to the playthrough. Deciding he was not willing to wager $100,000 on virtual blackjack in just seven days, this user navigated to the "bonus forfeiture" option. Without being asked to confirm or warned that he would be losing his entire initial deposit, this user's account balance was reset to zero. The user was shocked that "forfeiture" of the bonus included not just the promotional incentives and associated winnings, but his own $1,000 deposit.

116.    A number of complaints to the Better Business Bureau reflect identical concerns about unknowingly forfeiting deposits associated with DraftKings' "Casino Deposit Match" promotions.[14] Other complaints to the Better Business Bureau reflect customers' confusion surrounding the varying contributions of different games to the playthrough and uncertainty about the meaning of a "15x playthrough."

117.    Furthermore, several Better Business Bureau complaints cite this same issue.

**D. DraftKings intentionally targets young men who are most vulnerable to develop gambling addictions and designs its interface to prevent them from understanding the terms of offers advertised to them**

118.    Gambling products are not typical consumer products. Both the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and the World Health Organization treat addiction to gambling in the same diagnostic category as addiction to heroin, cocaine, and tobacco.

119.    Digital mediums, like computers and cell phones that host DraftKings, increases the likelihood of habit-forming behavior through portability and connectivity, which provide

---

[13] https://www.reddit.com/r/DraftKingsDiscussion/comments/18uj96p/bonus_forfeiture/
[14] https://www.bbb.org/us/ma/boston/profile/online-gaming/draftkings-inc-0021-134635/complaints

greater ease-of-use, ready availability, rapid gratification, and a tendency to enable "context-independent" cues that trigger habit response.[15]

120.    Furthermore, habits are most often formed as the result of goal-directed behavior, which DraftKings enables by requiring users to chase arduous playthrough requirements.

121.    Goals drive people to form habits by encouraging repeat actions, even when they are actively aware of not wanting to develop an undesirable habit. Because most people are unaware of the habit-cuing influencing their behavior, they often attribute the formation of an undesirable habit to the pull of temptations or suppressed desires.

122.    DraftKings designs its promotions—which standout in the industry for their high playthrough requirement and forfeiture consequences for non-completion—to maximize the likelihood that users will begin to develop habits in the course of completing them.

123.    Unsurprisingly, as online gambling on DraftKings exploded in 2021, the National Council on Problem Gambling reported overall increases of 43% in calls and 84% in online chats in just that year.[16]

124.    States that have legalized online gambling have seen dramatic increases in calls to gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the first year after legalization.

125.    In New Jersey, calls have risen a staggering 277% between since 2018 as DraftKings blanketed the airwaves with ads for new users.

---

[15] Bas Verplanken, *The Psychology of Habit: Theory, Mechanisms, Change, and Contexts*, Springer Nature Switzerland AG, 2018, https://link.springer.com/book/10.1007/978-3-319-97529-0
[16] *National Problem Gambling Helpline Modernization Project*, NATIONAL COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/problem-gambling/helpline-modernization/#:~:text=In%202021%2C%20calls%20to%20the%20National%20Problem%20Gambling,we%20expect%20these%20numbers%20to%20continue%20to%20grow (last visited Nov. 21, 2024).

126.    Gambling addiction is particularly prevalent in young men in their 20s, not coincidentally a key demographic for DraftKings.

127.    According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30 percent from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[17]

128.    According to a spokesperson for Gamblers Anonymous, there has been "a dramatic increase in the number of young men developing compulsive gambling issues and showing up to meetings since online sports gambling became legal."[18]

129.    Unsurprisingly, DraftKings's target demographic overlaps heavily with the group most at risk of gambling addiction. As of 2021, 90% of DraftKings' users were male and more than half were in their teens, twenties, or early thirties.

130.    In fact, according to recent research from the American Psychological Association, analysis of data from New Jersey reveals that "the fastest-growing group of sports gamblers are between 21 and 24 years old".[19]

131.    DraftKings touts that its "[s]ophisticated data science drives marketing decisions," which "delivers the right message, to the right user at the right time," to maximize

---

[17] Meghan Gunn, *These are the Real Dangers of the Sports Betting Boom for Young Men*, NEWSWEEK MAGAZINE, Mar. 22, 2023 https://www.newsweek.com/2023/04/07/sports-betting-boom-linked- rising-gambling-addiction-anxiety-suicide-1789055.html (last visited Nov. 15, 2024)

[18] Maxwell Strachan, *The Rise of Mobile Gambling is Leaving People Ruined and Unable to Quit*, VICE, Sept. 6, 2022, https://www.vice.com/en/article/ake7gk/therise-of-mobile-gambling-is-leaving-people-ruined-and-unable-to-quit (last visited Dec. 2, 2024).

[19] Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, AMERICAN PSYCHOLOGICAL ASSOCIATION – MONITOR ON PSYCHOLOGY, July 1, 2023, https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain

return on investment.[20]

132.    DraftKings targeted marketing often reaches young people, particularly young men, who are not yet old enough to legally gamble.

133.    Moreover, DraftKings intentionally designs its marketing and platform interface to minimize the likelihood that users will engage with the terms of use.

134.    Consumer psychology research has identified several factors that decrease people's likeliness to read the fine print of consumer contracts.[21] First, researchers point out that when contract forms are intentionally made not user-friendly, consumers are less likely to engage with them.

135.    For example, researchers at New York University note that "Font sizes are often very small and the clauses within sentences can be very long which can make it physically difficult and taxing for consumers to read."[22]

136.    The terms of DraftKings' Casino Deposit Match Promotion are over fifteen hundred words long with small font sizes, lengthy sentences, legalistic language, and confusing organization that all make it excessively taxing for users to follow.

137.    The NYU researchers' paper goes on to mention that "Even if consumers were

---

[20] https://www.slidebook.io/company/draftkings/presentation/4482ce71d778bb9781863ed375bebca1-/slide-/4482ce71d7-78bb9781863ed375bebca1_24/ (last visited Nov. 21, 2024).

[21] Meirav Furth-Matzkin & Roseanna Sommers, , *Fool Me Once, Shame On Me: How Consumers And Lawyers Perceive The Fine Print In Deception Cases*, HARVARD JOHN M. OLIN CENTER FOR LAW, ECONOMICS, AND BUSINESS - FELLOWS' DISCUSSION PAPER SERIES, June 2018, https://www.law.harvard.edu/programs/olin_center/felows_papers/pdf/Furth_82.pdf (last visited Dec. 10, 2024); Florencia Marotta-Wurgler, , *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, U. CHI. L. REV., Feb. 6, 2011, https://lawreview.uchicago.edu/sites/default/files/78-1-Increased%20Disclosure%20in%20Software%20Contracts-Marotta-Wurgler.pdf (last visited Dec. 10, 2024).

[22] Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, NYU JOURNAL OF L. AND BUS., Feb. 9, 2009, https://papers.ssrn.com/-sol3/papers.cfm?abstract_id=1340166 (last visited Dec. 10, 2024).

able to dissect the legalese in which contracts are written, the process of doing so would be exceedingly difficult especially since relevant passages are often buried in other language."

138.     DraftKings only reveals the truth of its unfavorable promotions after multiple paragraphs describing age and location requirements for betting on their platform. Even if a user is able to hunt down language that describes the promotion's reality, it is written in a way that makes it unlikely that a layperson—who is eager to get gambling—will understand.

139.     Furthermore, according to the NYU researchers, "consumers will also often have difficulty imagining problems that might arise. That is, scenarios under which things can go wrong never enter their minds."

140.     After exposure to DraftKings promising headlines, consumers are unlikely to predict that redeeming these promotions will entail such onerous requirements and fruitless rewards.

141.     The authors also write that "even if some consumers manage to foresee the possibility of potential negative consequences, they will often be overly optimistic in assessing the probability of those negative consequences once they have invested even a small amount of time, effort, or other resources pursuing a goal."

142.     By the time a user is presented with the full terms of a promotion, they have grown excited about DraftKings' alluring promises and have put time and effort into navigating to the platform's compelling offer.

143.     Moreover, research shows that social norms often discourage reading the fine print of a contract. Consumers believe that DraftKings, a company operating in a heavily regulated industry, can be trusted for the promises it's making in its advertisements. Consumers do not think, therefore, that they need to carefully read pages of fine print to protect themselves.

144.    Finally, DraftKings' contract is one of adhesion with terms that are non-negotiable, "[a]nother major reason why people might not read the contracts that they sign… [is that t]he consumers' choice is to accept the offered agreement or go elsewhere." DraftKings customers understand that reading the fine print will not lend itself to mediating a more favorable deal.

145.    DraftKings exploits these factors and misleads consumers about material aspects of its promotions, secure in the knowledge that few consumers will notice if the fine print contradicts what they believed they had signed up for.

146.    Plaintiff Youngs, like many young men targeted by DraftKings, has lost a significant amount of money gambling on DraftKings' online platform.

**E.  DraftKings' "Risk-Free Bet" promotions**

147.    DraftKings offers a variety of promotions to new users that falsely state they can try out the platform without any risk of losing money. The dollar amount that can be placed "Risk-Free" or "No Sweat" varies but can be as much as $1,000.

148.    Such tantalizing offers have been effective at persuading new users to open betting accounts they may not otherwise have opened and to wager amounts they may not otherwise have risked. That is what happened to Plaintiff Youngs. After DraftKings' lured Plaintiff Youngs and others into placing bets based on the promise that they would be risk-free, Plaintiff Youngs discovered that the money they wagered had in fact been lost.

149.    Since at least 2020, DraftKings has advertised no-risk gambling promotions to countless people watching MLB, NFL, NBA, and NHL games on television.

150.    For those not watching televised sports, DraftKings ads for no-risk promotions were inescapable on New Jersey highways and public transportation.

151.    DraftKings has also advertised risk-free betting on Twitter, Instagram,

Facebook, and TikTok feeds of millions of potential users through direct advertising and paid partnerships with influencers.



*Figure 3: Post on Twitter (now X) from user @SoManyWays2Joey (host of a popular NHL podcast on a network partnered with DraftKings) advertising a "Risk-Free Bet" up to $1,000; dated July 14, 2022. (https://x.com/SoManyWays2Joey/status/1547647893254746116)*

152.    Finally, DraftKings has, from time to time, directly emailed its users, including Plaintiff Youngs, encouraging them to log in and place no-risk bets.

153.    These no-risk bets involve substantially more risk than DraftKings' promotional materials lead customers to believe. When a customer loses their initial bet, they are not in the same position as they were before placing the wager.

154.    DraftKings' advertising misleading implied the contrary and concealed several key feature of the no risk promotion that would have allowed customers to determine that opting into the promotions did, in fact, involve risk of losing their money.

155.    First, DraftKings misrepresented that a user could place a bet at no risk to themselves when there was necessarily risk, because a consumer cannot simply cash out a refund if they lose, but instead must place another bet (the so-called "Bonus Bet") that they

receive in the event they lost their original wager.

156.    Second, DraftKings misleadingly implied that a user could be restored to their original position if they original bet lost because they would receive a "Bonus Bets."

157.    When a user places a bet as part of a no-risk promotion, they are wagering their own money.  If the customer loses their initial bet, their account is debited the amount of their loss in U.S. dollars (in this case $100), and their account is credited with a "Bonus Bet" of the same amount. But a "Bonus Bet" is not worth its cash equivalent even when placed on an even-odds winning bet.

158.    According to DraftKings itself, "Bonus Bets," have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn from the account. Thus, in order to turn a "Bonus Bet" into U.S. dollars that can be deposited back into a bank account, a user must use the "Bonus Bet" to place an additional wager within the specified time limit *and win*.

159.    Furthermore, even when a customer wins a bet with the "Bonus Bet", they do not receive the stake back—which is what DraftKings purportedly gave them for free. If a customer uses a $100 "Bonus Bet" on a winning wager with 50/50 odds, they are paid out $91 ($100 winnings, minus 9% vig, without a return of the $100 stake). Of course, there is no guarantee that a user will win the "Bonus Bet". If a "Bonus Bet" loses, the user will be paid out nothing.

160.    Finally, DraftKings misrepresented there was no risk because there is the risk of losing all the money originally wagered. If a user loses their "Bonus Bet," they have no further means of recouping the initial amount they wagered.

161.    The false promise of "Risk-Free" and "No Sweat" bets was strategically and

misleadingly designed to overcome new users' skepticism of gambling and to grab market share in the freshly legal sports betting industry.

162.    DraftKings was aware of the effects of such promises on new users' thinking: "If it's no-risk, why not bet more?"

163.    DraftKings deliberately tricked gambling-naive customers in New Jersey into falling for these promotions by not clearly communicating that those signing up for the "No Sweat" promotion were, in fact, at risk of losing their money. Customers relying on their commonsense understanding of the "No Sweat" offer on promotional materials—and not understanding the complex terms laid out several layers deep in fine print that contradict DraftKings' large-print promises—were surprised to discover upon losing their "No Sweat Bet" that, in order to get *some* of their money back, they needed to make an additional, successful wager. DraftKings intentionally supplemented this confusion by using the dollar symbol ($) in its promotional materials.

164.    As alleged above, DraftKings advertised these no-risk bets to New Jersey users on numerous occasions, often targeted specifically to new customers or existing customers who had not placed a certain type of bet before.



*Figure 5: A March 2024 advertisement promoting a "No Sweat Bet" of up to $1,000 for new customers used by DraftKings in various digital advertising media including on Twitter.*



*Figure 7: Twitter post, dated April 19, 2022, promoting a "Risk-Free Bet".*

*(https://x.com/DKSportsbook/status/1516544714425708552)*

165.    Some of DraftKings' advertisements for no-risk promotions include very small print referencing other terms.

166.    In fact, DraftKings goes to great lengths to make it onerous to even comprehend that fine print terms apply. First, the link to the terms of the promotion are not even made available to a user until after the customer has already logged into the platform in response to an off-platform advertisement for the promotion and clicked through several steps to get to the point of placing the supposedly no-risk bet.

167.    Even then, DraftKings buries the most important term—that if you lose your original bet you only get an expiring "Bonus Bet" back which is not treated like a normal bet in how it is paid out. The vital information—which contradicts the large print promises that the

customer is not at risk if they lose—only appears behind a tiny hyperlinked information symbol and then, if the symbol is clicked, deep in very small text below several blocks of much larger text focusing on other aspects of the promotion.



*Figure 8: Screenshot taken November 11, 2024, of the DraftKings user interface for placing a "No Sweat" bet. No terms and conditions are displayed. Instead, they are obscured by an easy-to-miss hyperlink, seen here as the almost imperceptible "i" with a small green circle around it next to "NBA No Sweat SGP or SGPx"*

168.    A user need not—and Plaintiff Youngs did not—ever see the full terms before opting in to the promotion on the basis of DraftKings' advertising that led them to believe they could place a bet with no risk.

169.     For example, a user could opt into a "No Sweat" NBA same game parlay on DraftKings by flipping the green switch in the app shown above without ever clicking the tiny I symbol. Otherwise, they are never shown this disclosure of the promotion's full terms, which itself buries the lead:



years of age or older (18+ if in DC/KY/NH/WY) (19+ if in CA-ONT). Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gambling, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

In addition to the eligibility requirements set forth above and in the DraftKings Terms of Use, to participate in the Promotion, customers must (1) be a registered DraftKings Sportsbook customer with an active account; (2) receive an offer to participate in this Promotion; and (3) opt-in by clicking on the appropriate link or button within the Promotional Period.

NO SWEAT BET REDEMPTION

Upon completion of the promotion requirements, eligible customers will be awarded one (1) No Sweat Bet (the "Token"). Token valid only on 11/27 NBA bets (the "Qualifying Bet"). Minimum odds per leg of -500 or longer. Cashed-out bets and voided bets will void this Promotion. Bets placed with bonus rewards (including but not limited to Bonus Bets, Odds Boosts/Surges, Profit Boosts, etc.) are not valid. Token expires at the conclusion of the final 11/27 NBA game. Qualifying Bet must be placed using cash from your cash balance or DK Dollars. Maximum reward limits apply and vary by customer cohort. Maximum reward limits will be clearly and conspicuously disclosed to the customer upon opting in.

No Sweat Bet Tokens are single-use, non-withdrawable, and have no cash value. Must meet Qualifying Bet criteria and select Token BEFORE placing Qualifying Bet. Token only applies to Qualifying Bet. Reward issued only if Qualifying Bet loses after applying Token. Reward issued as Bonus Bet(s) based on the amount of losing Qualifying Bet. No Sweat Bet may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

REWARD LIMITATIONS

Bonus Bets are single-use, non-transferable, non-withdrawable, and have no cash value. Bonus Bets are valid for seven (7) days (168 hours) from the time they are credited to customers' accounts. Customers can choose when to use Bonus Bets and must select the Bonus Bet in their betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and

betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and wins, only the profit of $10 will be credited to the customer's account. Bonus Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

GENERAL TERMS

Limit one (1) offer per customer. Customers must opt-in to this Promotion each time it is offered. Opting-in to this Promotion during a single day is only valid during that day and does not opt the customer into future periods. See DraftKings Sportsbook Terms of Use for information and limitations on wagering. Each customer will be notified when they have received an award by (1) a bell notification (this is a notification that displays as a bell icon on the home page of the DraftKings Sportsbook app and website that can be clicked on to view short confirmation copy and terms) and/or (2) an automatically triggered email if the customer successfully entered the promotion and completed the promotion requirements. Whether a customer has committed abuse of this Promotion, violated the Promotion Terms or DraftKings Terms of Use, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. Should you wish to cancel your participation in this promotion at any time, please contact customer experience at sportsbook@draftkings.com. Upon cancellation, you may withdraw any remaining funds deposited in connection with this promotion subject to DraftKings Terms of Use. Any wager placed on DraftKings Sportsbook in connection with the promotion cannot be rescinded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the terms and conditions of this Promotion. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings account holders are responsible for any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors in bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Promotion Terms or DraftKings Terms of Use, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or



*Figure 9: The full terms of use for the promotion pictured in Figure 7. If a user navigates to these terms through the obscured hyperlink, they are met with an impractically small font size.*

170.    Regulators are increasingly catching on to the misleading language DraftKings and other sportsbooks use in advertising "risk-free" bets. Several illustrative examples are discussed below.

171.    In Ohio gambling regulators have said such "free" or "risk-free" inducements are "false, misleading and explicitly against" state law. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions isn't good enough, he added. "We are not

supportive of trying to put the truth in small print."[23]

172.    DraftKings was sent a notice of violation by the Ohio Casino Control Commission which included a penalty of $150,000 for the use of "Risk-Free Bet" language. Previously, DraftKings had received a notice of violation from the same commission for advertising to individuals under the age of twenty-one.

173.    In 2022, the New York Attorney General's office admonished: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness."[24]

174.    The Massachusetts Gaming Commission prohibits sportsbooks from running promotions advertised as "free" or "risk-free" if a bettor needs to risk their own money as part of the promotion. *See* 205 Mass. Code Regs. § 256.04. Colorado has imposed a similar prohibition. *See* 1 Colo. Code Regs. § 207-2:9.4

175.    Even the NBA took a stance on the "risk-free" language, banning it on platforms operated by the NBA or its franchises in February of 2023.[25]

176.    Many of the sportsbooks, including DraftKings, started to quietly move away from explicit "risk-free" language in late 2022. In that year, DraftKings pivoted to labeling

---

[23] Danny Funt, *Sportsbooks call them risk-free bets. Just don't read the fine print.*, WASHINGTON POST, Dec. 26, 2022, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/ (last visited Nov. 17, 2024).
[24] *CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl*, NEW YORK ATTORNEY GENERAL, Feb. 10, 2022, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became,strings%20attached%20without%20consumers%20awareness (last visited Nov. 17, 2024).
[25] Bill King, *Concerned about betting's inherent dangers, NBA to ban 'risk free' advertising*, SPORTS BUSINESS JOURNAL, Feb. 6, 2023 https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Upfront/betting.aspx (last accessed Nov. 21, 2024).

these offers "No Sweat" bets. These promotions are materially no different, and just as misleading, as their "Risk-Free" predecessors, particularly considering that consumers in New Jersey still associate these offers, however labeled, with the "Risk-Free" promotion campaigns that were incessantly advertised on countless NFL, NBA, NHL, and MLB games. Nevertheless, DraftKings has continued to imply that betting on its platform in New Jersey can be no-risk as recently as December 2024.



*Figure 10: A "No Sweat" NBA offer on the DraftKings Sportsbook app from December 4, 2024.*

177.    According to a Washington Post article, industry participants admitted publicly that advertising offers as no-risk was "unclear".

178.    Nevertheless, DraftKings continued to make these offers because it expected and intended consumers to be misled by its "Risk-Free" and "No Sweat" promotions.

179.    At no time in DraftKings' marketing or during DraftKings' sign-up process were Plaintiff Youngs and the Class Members warned of the true financial risks of using DraftKings' services to place a bet, including the immediate and acute risk of losing the entire amount in that initial bet, the risk that losses would never be reimbursed by Defendant, and the longer term financial and psychological risks of developing a gambling addiction.

180.    As described above, Defendants' marketing (including during the user sign-up process) misrepresented and omitted several key facts about the "No Sweat" bet promotions.

181.    Because a "Bonus Bet" must be gambled quickly and cannot be deposited in the customer's bank account as cash, there is nothing free of risk about the transaction.

182.    However, customers like Plaintiff Youngs who were misled into thinking that they could bet without risk and then lost their bet ended up losing a substantial portion of their initial stake.

183.    Had Plaintiff Youngs and Class Members understood the true risk inherent in making these "risk-free bets," they would have acted differently and not lost as much money.

## F.  DraftKings' $1,000 sign-up bonus promotions

184.    No-risk bet offers are not the only deceptive promotions that DraftKings employs. For several years, DraftKings has also been offering a bonus of up to $1,000 for new customers who opened accounts and deposited money.

185.    Since at least 2020, DraftKings has advertised their promises of a "1,000 Sign Up Bonus" to countless Kentuckians watching televised MLB, NFL, NBA, and NHL games, and have made themselves regulars on the Twitter, Instagram, Facebook, and TikTok feeds of their millions of followers.

186.    DraftKings also advertised sign-up bonuses on billboards and public transportation in New Jersey.

187.    The unfair and deceptive terms of this promotion, which they offer to this day, make it inordinately unlikely for a user to obtain the advertised $1,000. Omitted from the promising headline is the reality that DraftKings will only match 20% of a user's deposit and will require a user to play through (and risk) 25x the amount of bonus money rewarded.

188.    In plain terms—which the fine print regarding this promotion deliberately obscures and the large-print advertisements for this promotion completely misrepresent—in order for a user to get a $1,000 bonus, they actually need to deposit five times that amount ($5,000), and then, within 90 days, *risk $25,000 on DraftKings sports bets*.

189.    Additionally, in order to satisfy the playthrough requirement, DraftKings requires that these bets be placed at minimum odds of -300 (meaning a bettor must risk $300 to win $100). This means bettors must place a series of highly-risky bets to satisfy the playthrough requirements.

190.    None of the foregoing is adequately disclosed to the customer.

191.    A new user is statistically likely, even using the most conservative betting approach, to lose money trying to satisfy the playthrough requirement.

192.    But even if they make it through all those steps, the $1,000 bonus is not rewarded as withdrawable cash funds, but rather as "DK Dollars" that hold no cash value, are

non-withdrawable, non-transferable, non-refundable, and can only be used for further gambling.

193.    DraftKings' advertising of the Bonus is also unfair and deceptive because an eligible consumer who is often a new participant in sports betting, would be unlikely to understand the cost and risk involved in qualifying for the $1,000 Bonus. In fact, if Plaintiff Youngs had understood the cost or the odds of winning the Bonus, he would not have acted upon the promotion.

194.    DraftKings advertised the "$1,000 Bonus" as a reward for signing up for its Sportsbook platform in these terms:



*Figure 11: DraftKings post on Twitter, dated February 15, 2022, using fan-favorite NBA player*

*Paul Pierce to promote false promises of a "Deposit Bonus up to $1,000".*

*(https://x.com/DKSportsbook/status/1493660970870312967)*



*Figure 12: Screenshot from an advertisement typical of those broadcasted by DraftKings on television and digital media in New Jersey during the Class Period.*



*Figure 13: A Twitter post, dated April 20, 2022, featuring rapper Lil Wayne and promising customers that they can simply "Download the [DraftKings] app today and get a deposit bonus up to $1,000". (https://x.com/DKSportsbook/status/1516830656721993729)*

195.    Plaintiff Youngs saw advertisements for DraftKings' sign-up bonus promotion shortly before he funded his account on DraftKings.

196.    Plaintiff Youngs was misled by the advertising for the promotion and, as a

42

result, he deposited more money than he would have with DraftKings had he been informed of the actual terms of the promotion.

197.    As with the no-risk promotion advertisements, the terms of this promotion are not fully disclosed in the advertisements and, to the extent that they are communicated, they appear in an illegibly small font-size—an order of magnitude smaller than the misleading text advertising the promotion—and are confusingly worded.

198.    Plaintiff Youngs and many other users signed up for DraftKings and funded their account anticipating that their deposit would be "matched" in full up to $1,000.

199.    Plaintiff Youngs and most users never became aware that there were additional terms, much less saw the full terms of the promotion or learned that their funds would not be matched in U.S. Dollars, not be matched on a 1:1 basis, and would only be matched at a rate of one DK Dollar for every $25 USD wagered.

200.    Notwithstanding the large text of DraftKings' advertisements, a new customer of DraftKings was never going to simply receive "up to $1,000" in exchange for signing up for the sportsbook platform and depositing $1,000, as the ads implied. In order for a new customer to obtain the "$1,000 Bonus," he or she would have to satisfy three very onerous requirements, explained only in the unreadably small font size above:

    a.  They would have to deposit $5,000 up front;

    b.  They would have to bet $25,000 within 90 days;

    c.  Their $25,000 in bets would have to be placed on wagers with odds of "-300 or longer."

201.    Plaintiff Youngs and other users could not reasonably have been expected to understand from the face of DraftKings' advertisements that, in order to receive a $1,000

bonus, he or she needed to immediately deposit $5,000, because the bonus amount is calculated as 20% of the consumer's first deposit.

202.    Plaintiff Youngs and other DraftKings sportsbook users could not reasonably have been expected to understand from the face of DraftKings' advertisements that the $1,000 bonus would not be provided at the time of their initial deposit, but that instead they would earn the bonus only $1 at a time for every $25 wagered. Thus, to receive the $1,000 bonus, the new customer would have to risk $25,000 within 90 days on bets that DraftKings' odds-makers consider to have a less-than-75% likelihood of winning (–300 odds or longer).

203.    Plaintiff Youngs and other DraftKings sportsbook users did not understand and could not reasonably have been expected to understand based on DraftKings' advertisements that, in order to place bets for at least $25,000 over 90 days to qualify for the Bonus, they would have had to wager an average of more than $276 gambling on sports every day for three months.

204.    Plaintiff Youngs and other DraftKings sportsbook users also did not understand that, even if they met the $5,000 initial deposit and $25,000 of gambling in 90 days requirements, the Bonus would not be awarded in funds that could be withdrawn, but only as a non-withdrawable credit ("DK Dollars") to be used for further gambling.

205.    Plaintiff Youngs and other DraftKings sportsbook users also could not reasonably be expected to understand that they would be required to make bets with a high level of risk to satisfy the play-through requirements. They could not have been expected to understand that, contrary to the express terms of the advertisements for the "Bonus Match" promotion, not all bets they made on DraftKings Sportsbook would count toward the $1,000 bonus. In fact, any bets that DraftKings' oddsmakers believe have a greater than ~75% chance

of winning would not count toward the required total bets of $25,000 within 90 days.

206.    Gambling regulators, like the New York Attorney General, have sounded warning bells about the misleadingness and illegality of deposit match promotions just like the ones DraftKings used on New Jersey residents.

207.    DraftKings knew, or should have known, that its advertisement and promotion was deceptive to its target customers, who were customers new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were in readable English on the company's platform or in a font size that a reasonable consumer could be expected to read.

208.    DraftKings knowingly and intentionally designed this promotion to maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms.

## G. These promotions worked on Plaintiff Youngs exactly as DraftKings intended them to

209.    Plaintiff Youngs, a self-described sports fanatic began using DraftKings for daily fantasy sports contests in 2016, before he turned twenty-five years old.

210.    Around 2018, when DraftKings' online sportsbook became available in New Jersey, Plaintiff Youngs saw ads for new sportsbook user promotions including a deposit match promotion on a variety of digital platforms, and already having an account on DraftKings and believing it to be a trustworthy company, he took the opportunity to begin sports betting.

211.    Plaintiff Youngs was surprised when he did not get his deposit matched in cash, but instead only got a portion of it matched in DK Dollars after he satisfied some of the playthrough requirements by making numerous wagers on sporting events.

212.    In attempting to satisfy the sportsbook deposit match playthrough requirements, Plaintiff Youngs placed many wagers on DraftKings of increasing amounts.

213.    Based on Plaintiff Youngs' behavior on the platform, DraftKings' algorithms identified Plaintiff Youngs as the type of user that might be most profitable to the company and began offering him more and more promotions requiring more and more playthroughs to satisfy.

214.    Among these promotions were "Risk-Free Bet" promotions, which Plaintiff Youngs was surprised and dismayed to discover were not actually risk free and, as described above, required him to place more wagers if he lost the initial "risk-free" bet just to have a chance to win back some of the money he lost. These promotions were also intentionally designed to inculcate dangerous gambling habits in Plaintiff Youngs.

215.    One of these dangerous gambling habits that the "Risk-Free Bet" promotions develop is chasing losses, wherein a gambler tries to win back money that they've lost in one bet by placing further bets. Prior to being enticed into using the "Risk-Free" promotions, Plaintiff Youngs did not chase his losses, but after opting into it, discovering his initial bet was not actually risk-free and that all it gave him was an opportunity to gamble more to recoup his money, Plaintiff Youngs began chasing his losses on DraftKings more and more.

216.    Eventually, because Plaintiff Youngs was betting more and more money on DraftKings, he was invited to become part of the VIP Player Program, which offered him some "perks" like expedited account treatment, "custom offers," and a VIP host who would reach out personally to him entreating him to gamble more and offering him opportunities to earn deposit bonuses for doing so.

217.    Then, in late-2022, Plaintiff Youngs began seeing deposit match promotions for

DraftKings' online casino on his social media feeds as well as via direct emails from DraftKings. Plaintiff Youngs also began seeing "DK Casino Credits" in his account, which, like DK Dollars, requires a user to gamble with it to convert it into actual money that can be withdrawn or used as cash on the DraftKings sportsbook.



*Figure 14: Email from DraftKings to Plaintiff Youngs informing him that he'd been given "Free Credits" usable on the DraftKings Casino.*

218.    Through these DK Casino Credits, DraftKings began turning Plaintiff Youngs from a developing sports gambling addict to a full-blown online casino gambling addict.

219.    As Plaintiff Young's interest in the casino increased, and as the free DK Casino Credits dried up, Plaintiff Youngs began taking advantage of the Casino Deposit Match

promotion offers he was seeing on digital media and in his email.

220.    Every few days DraftKings would send him a new Casino Deposit Match offer, promising that if he deposited $2,000 more dollars on the platform and wagered at the casino, DraftKings would give him $2,000 in cash.

221.    If Plaintiff Youngs went a few days without making a deposit on DraftKings, he would be inundated with ads for the Casino Deposit Match Promotion both in his email and in his social media feeds.



*Figure 15: Body of email Plaintiff Youngs received in June of 2023—one of tens like it— exhorting him to opt into DraftKings Casino Deposit Bonus*



*Figure 16: Body of email Plaintiff Youngs received in July 2024*



*Figure 17: Image from email Plaintiff Youngs received in December 2023.*

222.    What Plaintiff Youngs did not initially understand was the fine-print of these offers, which differed substantially from the sportsbook deposit match offers he'd previously taken advantage of. Rather than paying out incrementally, as the playthrough requirements were met, the Casino Deposit Match promotion was all or nothing: either Plaintiff Youngs met the entire playthrough requirement—a challenging prospect given the unfavorable odds of the casino games that were eligible for the full playthrough credit—or he lost everything he put towards the promotion, including whatever was left of his initial deposit after wagering it on the casino games.

223.    The first few times Plaintiff Youngs opted into the Casino Deposit Match promotion, he did not realize this feature of the terms of the promotions, which were contrary both to the explicit large text of the offers he was sent and to his expectations having used the sportsbook deposit match promotion previously. As a result, Plaintiff Youngs lost money when all of the money associated with the promotion was removed from his account after seven days because he failed to realize the stakes of not completing the playthrough requirements within the time window.

224.    After these experiences, and still in the throws of his gambling addiction, Plaintiff Youngs began attempting to complete the full playthrough requirements of the Casino Deposit Match promotion every time he opted in. Frequently, he was unable to ever receive the deposit match because he lost all of the money wagering attempting to meet the playthrough requirements.

225.    Nevertheless, because of the gambling addiction DraftKings had intentionally inculcated in Plaintiff Youngs, he continued opting into the Casino Deposit Match promotion, chasing his losses, and attempting to win back some of more than $200,000 that he lost to DraftKings in 2024 alone.

## CLASS ALLEGATIONS

226.    Plaintiff Youngs brings this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the following class and subclasses, which is defined as follows:

227.    **Casino Deposit Match Promotion Class:** Any person who participated in a DraftKings Casino Deposit Match Promotion and lost part or all of their initial deposit or winnings.

a. **New Jersey Subclass:** any person in the Casino Deposit Match Promotion Class who entered the promotion while in the State of New Jersey.

b. **Connecticut Subclass:** any person in the Casino Deposit Match Promotion Class who entered the promotion while in the State of Connecticut.

c. **Pennsylvania Subclass:** any person in the Casino Deposit Match Promotion Class who entered the promotion while in the State of Pennsylvania.

d. **Michigan Subclass:** any person in the Casino Deposit Match Promotion Class who entered the promotion while in the State of Michigan.

e. **West Virginia Subclass:** any person in the Casino Deposit Match Promotion Class who entered the promotion while in the State of West Virgina.

228.    **New Jersey No-Risk Promotion Class:** Any person who wagered in the state of New Jersey and opted into a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their bet.

229.    **New Jersey Sportsbook Signup Bonus Promotion Class:** Any person who opened an account and deposited money while in the state of New Jersey in response to a DraftKings sportsbook "$1,000 Bonus" promotion for new customers.

230.    Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

231.    The Class Period for each promotion class is tolled to the earliest date of DraftKings' distribution of each of the relevant promotions under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the

true terms of its promotions. As described more fully above, Plaintiff Youngs has been misled and injured by the cumulative effect of DraftKings' misleading advertisements and promotions.

232.    Alternatively, the Class Period extends from the relevant statutory limitations period for each cause of action through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

233.    This case is properly brought as a class action under Rule 23 for the following reasons:

a. **Ascertainability:** The Class Members can be readily identified through Defendants' records which will include a record of all those users who signed up for the promotion and must also track customer's state of residence. The members will be identified by filtering DraftKings' records for users from the relevant jurisdictions who entered into each of the identified promotions and lost money.

b. **Numerosity (Rule 23(a)(1)):** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiff at this time. However, Plaintiff believes there are at least tens of thousands of Class Members. The number and identity of Class Members can be determined through discovery.

c. **Commonality and Predominance (Rule 23(a)(2)):** Plaintiff Youngs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

- Whether DraftKings misrepresented in its advertisements that Plaintiff Youngs and the other No-Risk Promotion Class Members would not be at risk of losing money when they made a deposit and placed a first bet;

- Whether DraftKings intentionally designed its advertisements for the no-risk bet in such a way as to mislead Plaintiff Youngs and the other No-Risk Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings' representations and omissions about the no-risk promotions are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings misrepresented in its advertisements the Sportsbook Bonus it was offering to Plaintiff Youngs and the other Sportsbook Signup Bonus Promotion Class Members:

- Whether DraftKings misrepresented in its advertisements that Plaintiff Youngs and the other Class Members would receive an amount matching their deposit immediately upon making the deposit for the sportsbook Signup Bonus;

- Whether DraftKings intentionally designed its advertisements for these promotion in such a way as to mislead Plaintiff Youngs and the other Class Members in order to induce them to sign up and make more bets than they otherwise would have;

- Whether DraftKings' representations and omissions about the Casino Deposit Match Promotion are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings adequately disclosed the facts and/or risks concerning the use of its Casino Deposit Match Bonus;

- Whether DraftKings' actions violate state statutory law regarding unfair business practices invoked herein;

- Whether DraftKings' actions violate the common law causes of action invoked herein; and

- The appropriate measure of damages to award Plaintiff Youngs and the other Class Members.

- The appropriate injunctive relief to which Plaintiff Youngs and the other Class Members are entitled.

d. **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiff Youngs and each of the other Class Members were injured in the same way by the deceptive promotion at issue. The promotion identified was widely distributed by DraftKings over a long period of time with consistent terms and the promotion that Plaintiff Youngs responded to does not materially differ from promotions that any other Class Member would have responded to. The misrepresentations at issue were substantially uniform in content, presentation, and impact upon Plaintiff Youngs and Class Members. Plaintiffs' injury has been caused by the same conduct of DraftKings, which would provide the same basis for a claim for all Class Members.

e. **Adequacy of Representation (Rule 23(a)(4)):** Plaintiff Youngs is an adequate Class representatives because his interests do not conflict with the interests of

the other Class Members whom he seeks to represent. Plaintiff Youngs intends to vigorously prosecute this action, and Class Members' interests will be fairly and adequately protected by Plaintiff Youngs and their chosen counsel. Plaintiff Youngs has retained counsel that is competent and experienced in complex class action and consumer protection and Plaintiff Youngs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiff Youngs nor their counsel have any interests adverse to the Class.

f.  **Superiority (Rule 23(b)(3)):** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for each individual Class Member is likely relatively small, and if each Class Member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class Member. This is an appropriate forum in which to litigate these claims, as the New Jersey state population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

g.  **Declaratory and Injunctive Relief (Rule 23(b)(2)):** DraftKings acted or

refused to act on grounds generally applicable to Plaintiff Youngs and the other Class Members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**Violation of New Jersey Consumer Fraud Act—Unconscionable or Abusive Practice, N.J.S.A. 56:8–1, *et seq.* (Asserted on behalf of New Jersey Casino Deposit Match Promotion Sub-Class)**

234.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

235.    Plaintiff Youngs brings this claim against DraftKings under the New Jersey Consumer Fraud Act, 56:8–1 *et seq.*, individually and on behalf of the New Jersey Sub-Class.

236.    The Consumer Fraud Act declares unlawful "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J.S.A. 56:8–2.

237.    DraftKings and co-Defendants are "person[s]" as defined by N.J.S.A. 56:8–1(d).

238.    Plaintiffs, as well as each member of the Class, are "person[s]" as defined by N.J.S.A. 56:8–1(d).

239.    The services and product offered to Plaintiff Youngs and each member of the Class constitutes "merchandise" as defined by N.J.S.A. 56:8–1(c).

240.    Plaintiff Youngs and Class Members are therefore entitled to the protections and remedies provided for by the New Jersey Consumer Fraud Act.

241.    Defendants engaged in an unconscionable and abusive practice by running a promotion with unclear terms that resulted in Plaintiff Youngs and Class Members risking and

losing their initial deposit based on their failure to satisfy the unreasonable terms of the promotion.

242.    Defendants' practice of reclassifying deposited funds as "bonus funds" and seizing those funds upon forfeiture of an unwanted promotion represents an unconscionable, deceptive, and unreasonable abuse of consumers and of its position in the market, which makes consumers more likely to trust that it will run promotions that are fair and reasonable.

243.    Defendants' practice of failing to clearly warn consumers that they are at risk of losing all of their deposit if they "forfeit" the promotion also represents an unconscionable, deceptive, and unreasonable abusive practice.

244.    Furthermore, the Casino Deposit Match Promotion is unconscionable and abusive because it is intentionally designed to inculcate gambling addictions in customers as they chase the illusory bonus by forcing them to gamble far more money and for far longer than they otherwise would.

245.    Defendants also knew and either allowed or intended that consumers frequently opt-into the Casino Deposit Match Promotion inadvertently and without intending to. This too constitutes an unconscionable and abusive practice.

246.    Defendants' conduct also violates New Jersey State Regulations for Internet Gambling insofar as it does not state the terms of the promotion "in a clear and conspicuous manner using plain language," does not "provide a clear and conspicuous method for a patrol to cancel their participation in an internet or mobile gaming promotion," and does not "[u]pon request for cancellation," clearly inform a patrol "of restricted funds that will be removed from the[ir] account." N.J. Admin. Code §§ 13:69O-1.12(c–d).

247.    Finally, Defendants' conduct also does not comply with the guidance regarding

casino promotions promulgated by New Jersey DGE, which state: "Unrealistic promotional wagering requirements shall not be offered."

248.    As a result of Defendants' misconduct, Plaintiff Youngs and Class Members suffered ascertainable losses.

249.    In light of the foregoing, Defendants violated N.J.S.A. 56:8–1, *et seq.*

250.    Plaintiff Youngs and Class Members bring this action pursuant to N.J.S.A. 56:8–19 and, in accordance therewith, are entitled to compensatory damages, statutory treble damages in an amount to be determined at the time of trial, attorney fees, and court costs.

**SECOND CAUSE OF ACTION**
**Violation of New Jersey Consumer Fraud Act—Misleading and Deceptive Advertisements, N.J.S.A. 56:8–1, *et seq.* (Asserted on behalf of New Jersey Casino Deposit Match Promotion Sub-Class)**

251.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

252.    Plaintiffs Youngs brings this claim against DraftKings under the New Jersey Consumer Fraud Act, 56:8–1 *et seq.*, individually and on behalf of the New Jersey Sub-Class.

253.    The Consumer Fraud Act declares unlawful "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J.S.A. 56:8–2.

254.    DraftKings and co-Defendants are "person[s]" as defined by N.J.S.A. 56:8–1(d).

255.    Plaintiffs, as well as each member of the Class, are "person[s]" as defined by N.J.S.A. 56:8–1(d).

256.    The services and product offered to Plaintiff Youngs and each member of the Class constitutes "merchandise" as defined by N.J.S.A. 56:8–1(c).

257.    Plaintiff Youngs and Class Members are therefore entitled to the protections and remedies provided for by the New Jersey Consumer Fraud Act.

258.    Defendants' promulgated false and deceptive promises and misrepresentations in its advertisements for the casino signup deposit match promotion.

259.    Defendants' advertisements suppressed and omitted material facts as to the terms of the promotion, including not including in readable print the terms of the promotions anywhere in advertisements about them.

260.    This suppression and omissions were knowing and intentional.

261.    Defendants' conduct also violated New Jersey law because its advertisements affirmatively and falsely represented that consumers were likely to receive a cash-value match of their deposit of as much as $2,000 when, in fact, DraftKings knew it was unlikely that consumers would ever qualify for such a match.

262.    In particular, Defendants engaged in misrepresentation when they failed to include in the advertisement any warning regarding the large play-through requirements for the bonus promotion or any mention of the risk that a consumer's initial deposit would be forfeit if they began but did not complete the promotion.

263.    These advertisements created a likelihood of confusion and misunderstanding among consumers.

264.    These advertisements also violated New Jersey state gambling regulations, which require that "Advertising shall be based upon fact, and shall not be false, deceptive or misleading" and in particular, "no advertising shall: (1) Use any type, size, location, lighting,

illustration, graphic depiction or color resulting in the obscuring of any material fact; or (2) Fail to specifically designate any material conditions or limiting factors." N.J. Admin. Code § 13:69C-14.2(d).

265.    These misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online gambling—about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiff Youngs and Class Members.

266.    DraftKings intended that Plaintiff Youngs and Class Members be misled by these misrepresentations and omissions.

267.    DraftKings induced Plaintiff Youngs and Class Members to rely on its misrepresentations and omissions to their detriment, when they deposited money, opted into the casino deposit match bonus and began betting on the casino without realizing the consequences of their doing so.

268.    As a result of Defendants' misconduct, Plaintiff Youngs and Class Members suffered ascertainable losses.

269.    In light of the foregoing, Defendants violated N.J.S.A. 56:8–1, *et seq.*

270.    Plaintiff Youngs and Class Members bring this action pursuant to N.J.S.A. 56:8–19 and, in accordance therewith, are entitled to compensatory damages, statutory treble damages in an amount to be determined at the time of trial, attorney fees, and court costs.

### THIRD CAUSE OF ACTION
### Intentional Misrepresentation (Asserted on behalf of Casino Deposit Match Promotion Class)

271.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

272.     Plaintiff Youngs brings this claim against DraftKings individually and on behalf of all Class Members.

273.     As described above, Defendants made material misrepresentations regarding the Casino Deposit Match Promotion.

274.     Defendants knew these representations were false and made them intentionally with the intention that users like Plaintiff Youngs and Class Members would rely on them in signing up for the promotion.

275.     These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings' platform and placing a bet in reliance on the promotion.

276.     Plaintiff Youngs and Class Members did rely on these misrepresentations when they deposited money, opted into the casino deposit match bonus and began betting on the casino without realizing the consequences of their doing so.

277.     Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the DraftKings service and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

278.     Plaintiff Youngs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

279.     As a state licensed betting platform, Defendants knew or should have known that its representations in marketing materials about the promotion were inaccurate and misleading.

Defendants had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

280.    Neither Plaintiff Youngs nor any reasonable consumer would have used Defendants in the same way if they had known of the true operation and risks of Defendants' service—risks the Defendants alone were aware of and misrepresented.

281.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff Youngs and members of the Classes were induced into Defendants' service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

282.    Plaintiff Youngs seeks all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## FOURTH CAUSE OF ACTION
### Negligence (Asserted on behalf of Casino Deposit Match Promotion Class)

283.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

284.    Plaintiff Youngs brings this claim against DraftKings individually and on behalf of all Class Members.

285.    The Defendants owed Plaintiff Youngs and Class Members a duty of care to ensure that users of the DraftKings platform were made aware of the material terms of the casino match promotion and did not inadvertently opt into the promotion without intending to.

286.    Defendants breach their duty of care by failing to prominently and clearly present the material terms of the Casino Deposit Match Promotion.

287.    Defendants breached their duty of care by failing to ensure that users only were

opted into the Casino Deposit Match Promotion if they understood its terms and risks and actually intended to see it through.

288.    The Defendants' breaches of their duty of care were actual and proximate causes of Plaintiff Youngs and Class Members' damages, in whole or in part.

289.    Plaintiff Youngs seeks all available remedies, damages, and awards as a result of Defendants' negligence, including compensatory damages and costs.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment (Asserted on behalf of Casino Deposit Match Promotion Class)

290.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

291.    Plaintiff Youngs brings this claim against DraftKings individually and on behalf of all Class Members.

292.    As alleged herein, Defendant has intentionally and/or recklessly made misleading misrepresentations to Plaintiff Youngs and Class Members to induce them to create accounts and place bets on its platform.

293.    As further alleged herein, DraftKings created and implemented a scheme to increase its share of the legal gambling market through a pervasive pattern of deceptive and unfair conduct including with deceptive advertising and the deliberate targeting of minors and underage users.

294.    DraftKings was unjustly enriched as a result of its wrongful conduct, including through the false and misleading promises that (i) DraftKings would give users an amount equal in U.S. dollar value to their deposit, and (ii) customers could cancel the promotion without losing their initial deposit.

295.    DraftKings was also unjustly enriched as a result of its wrongful conduct of

targeting underage users with its advertising and intentionally allowing them to use its platform without adequate age verification.

296.    Plaintiff Youngs and the Class Members have reasonably relied on these misleading representations and have not received the benefits promised by Defendant.

297.    Plaintiff Youngs and the Class Members therefore have been induced by DraftKings' misleading and deceptive representations about the promotional offers and its deceptive and unfair targeting of minors and have paid more money to DraftKings to place bets than they otherwise would and/or should have paid.

298.    Plaintiff Youngs and the Class Members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiff Youngs and the Class Members.

299.    The money DraftKings received was obtained under circumstances that were at the expense of Plaintiff Youngs and the members of the Class Members. In other words, Plaintiff Youngs and the Class Members did not receive the full value of the benefit conferred upon DraftKings.

300.    Therefore, it is inequitable and unjust for DraftKings to retain the profit, benefit, or compensation conferred upon it without paying Plaintiff Youngs and the Class Members back for the difference of the full value of the benefits compared to the value actually received.

301.    As a direct and proximate result of DraftKings' unjust enrichment, Plaintiff Youngs and Class Members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by DraftKings from its deceptive misleading, and unlawful conduct as alleged herein.

302.    Plaintiff Youngs pleads this claim separately as well as in the alternative to their

other claims, as without such claims they would have no adequate legal remedy.

### FIFTH CAUSE OF ACTION
### Conversion (Asserted on behalf of Casino Deposit Match Promotion Class)

303.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

304.    Plaintiff Youngs brings this claim against DraftKings individually and on behalf of all Class Members.

305.    The term purporting to give DraftKings the right to take possession of money that a user has won after opting into the Casino Deposit Match Promotion is unconscionable and unenforceable.

306.    Therefore, Plaintiff Youngs and Class Members were the rightful owners of identifiable sums of money they had won from wagers made either with their initial deposits or funds attributable to wagers made with their initial deposit.

307.    Plaintiff Youngs requested DraftKings return these monies.

308.    Some Class Members requested DraftKings return these monies.

309.    These requests were rejected and any request would have been futile.

310.    Plaintiff Youngs and Class Members demand return of these monies and for such further relief as this Court deems just and equitable.

### SIXTH CAUSE OF ACTION
### Violation of New Jersey Consumer Fraud Act—Misleading and Deceptive Advertisements, N.J.S.A. 56:8–1, *et seq.* (Asserted on behalf of New Jersey No-Risk Promotion Class)

311.    Plaintiff Youngs reasserts, realleges, and incorporates by reference all other paragraphs in the complaint.

312.    Plaintiff Youngs brings this claim individually and on behalf of all other Class Members.

66

313. DraftKings' conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the no-risk promotions.

314. DraftKings' conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the no-risk promotions.

315. DraftKings' conduct violated New Jersey law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers could place bets without risking their own money when, in fact, this was not the case.

316. DraftKings' conduct also violates the New Jersey gambling regulations as described above.

317. DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

318. DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its no-risk offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiff Youngs and Class Members.

319. DraftKings intended that Plaintiff Youngs and Class Members be misled by the misrepresentations and omissions in its no-risk promotions.

320. DraftKings induced Plaintiff Youngs and Class Members to rely on its misrepresentations and omissions.

321.     Without the misrepresentation and omissions in DraftKings advertising, Plaintiff Youngs and the No-Risk Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings' platform.

322.     As a direct and proximate result of DraftKings' unfair and deceptive practices, Plaintiff Youngs and the No-Risk Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive cash refunds for bets they placed and lost in reliance on DraftKings "Risk-Free" and "No Sweat" promotions.

323.     These acts caused substantial monetary injury to Plaintiff Youngs and the members of the No-Risk Promotion Class that they could not reasonably avoid.

324.     DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiff Youngs and the No-Risk Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiff Youngs and the No-Risk Promotion Class.

325.     DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiff Youngs and the Class and will continue to both damage Plaintiff Youngs and the New Jersey No-Risk Promotion Class and deceive the public unless enjoined by this Court.

326.     Plaintiff Youngs and the No-Risk Promotion Class seek relief under the New Jersey Consumer Fraud Act, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

## SEVENTH CAUSE OF ACTION

**Violation of New Jersey Consumer Fraud Act—Misleading and Deceptive Advertisements, N.J.S.A. 56:8–1, *et seq.* (Asserted on behalf of New Jersey Sportsbook Signup Bonus Promotion Class)**

327.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

328.    Plaintiff Youngs brings this claim against DraftKings under the New Jersey Consumer Fraud Act, individually and on behalf of the New Jersey Signup Bonus Promotion Class.

329.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the signup bonus promotions.

330.    DraftKings' conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the signup bonus promotions.

331.    DraftKings' sportsbook "$1,000 Bonus" offer is also unfair and deceptive because Plaintiff Youngs and the members of the Class were required to act differently than they could reasonably expect in order to obtain the promised bonus. Plaintiff Youngs and the members of the Class were required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

332.    DraftKings' conduct violated New Jersey law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers would receive a cash-value match of their deposit when, in fact, this was not the case.

333.    DraftKings' conduct also violates the New Jersey gambling regulations as described above.

334.    DraftKings advertised its promotion with no intent to sell its services as advertised.

335.    DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

336.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiff Youngs and Class Members.

337.    DraftKings intended that Plaintiff Youngs and Class Members be misled by the misrepresentations and omissions in its signup bonus promotions.

338.    DraftKings induced Plaintiff Youngs and Class Members to rely on its misrepresentations and omissions.

339.    Without the misrepresentations and omissions in DraftKings advertising, Plaintiff Youngs and Signup Bonus Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings' platform.

340.    As a direct and proximate result of DraftKings unfair and deceptive practices, Plaintiff Youngs and Signup Bonus Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive a cash deposit match for the funds they deposited in their DraftKings accounts.

341.    These acts caused substantial injury to Plaintiff Youngs and the members of the Signup Bonus Promotion Class that they could not reasonably avoid.

342.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiff Youngs and the Signup Bonus Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiff Youngs and the Signup Bonus Promotion Class.

343.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiff Youngs and the New Jersey Sportsbook Signup Bonus Promotion Class and will continue to both damage Plaintiff Youngs and the Signup Bonus Promotion Class and deceive the public unless enjoined by this Court.

344.    Plaintiff Youngs and the Class seek relief under the New Jersey Consumer Fraud Act, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Youngs, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A.  Certifying the proposed Classes, appointing Plaintiff Youngs as representative of the asserted Classes and appointing counsel for Plaintiffs as Class Counsel;

B.  Declaring that Defendants are financially responsible for notifying the Class Members of the pendency of this suit;

C.  Declaring that Defendant's policies and practices as described herein constitute a violation of the state consumer protection statutes;

D.  Enjoining Defendant from the wrongful conduct as described herein;

E.   Awarding actual and/or compensatory, multiple, punitive (as available according to law), and statutory damages;

F.   Awarding Plaintiff Youngs his reasonable costs and expenses of suit, including attorneys' fees;

G.   Awarding pre- and post-judgment interest to the extent the law allows; and

H.   Awarding such further relief as this Court may deem just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff Youngs hereby demands trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: January 7, 2025                          Respectfully submitted,

*/s/ Elvin Esteves*

Elvin Esteves
Law Office of Elvin Esteves LLC
460 Bloomfield Avenue, Suite 200
Montclair, NJ 07042
(862) 881-5552
elvin@estevesjuris.com

OF COUNSEL

Michael Kanovitz (*pro hac vice application forthcoming*)
Jon Loevy (*pro hac vice application forthcoming*)
Isaac Green (*pro hac vice application forthcoming*)
Aaron Tucek (*pro hac vice application forthcoming*)

LOEVY & LOEVY
311 N Aberdeen Street, Suite 3
Chicago, IL 60607
(312) 243-5900
mike@loevy.com

## **CERTIFICATION PURSUANT TO LOCAL RULE 11.2**

I, Elvin Esteves, the undersigned attorney of record for Plaintiff, do hereby certify to my own knowledge and based upon information available to me, that DraftKings' promotion practices are the subject of various lawsuits in other jurisdictions but that this is the only currently pending action in any court or administrative proceeding challenging the Defendants' promotional practices alleged in this complaint in New Jersey.

Dated: January 7, 2025

                    */s/ Elvin Esteves*

                    Elvin Esteves
                    Law Office of Elvin Esteves LLC
                    460 Bloomfield Avenue, Suite 200
                    Montclair, NJ 07042
                    (862) 881-5552
                    elvin@estevesjuris.com