**Elvin Esteves, Esq.**
**LAW OFFICE OF ELVIN ESTEVES LLC**
**460 Bloomfield Avenue, Suite 200**
**Montclair, NJ 07043**
**(862) 881-5552**
**elvin@estevesjuris.com**

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Matthew Youngs and Charles Thompson, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>DraftKings, Inc. and Crown NJ Gaming Inc. d/b/a DraftKings,<br><br>*Defendants*. | Case No. 2:25-cv-00179-SRC-JRA<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Matthew Youngs and Charles Thompson ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this class action against Defendants DraftKings, Inc. and Crown NJ Gaming Inc. d/b/a DraftKings (collectively "DraftKings"). Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

### <u>INTRODUCTION</u>

1.  In 2013, New Jersey became one of the first states in the nation to legalize internet gambling. Today, both New Jersey's internet casino industry and online sports betting industry are the largest in the nation in terms of dollars bet annually.

2.  Online betting allows consumers to use smartphone applications ("apps") to bet on casino games or sports anywhere in a state where it is legal, at any time.

3.  DraftKings, which markets itself as "America's #1 casino app," is the most

dominant player in New Jersey's internet gaming industry.

4.     DraftKings has driven much of the industry's rapid growth over the past few years through aggressive advertising to new users, including Plaintiffs.

5.     As described in more detail below, much of DraftKings's advertising is designed to entice new users is extremely misleading. Indeed, regulators from numerous states have begun pressuring DraftKings to change its behavior, and DraftKings has begun to do so. But these changes come too late for Plaintiffs and other putative class members who relied on DraftKings's misleading advertisements to set up new accounts, make deposits that they thought would be doubled by DraftKings, and place bets that they thought came without risk.

6.     This lawsuit seeks compensation for Plaintiffs' losses that resulted from DraftKings deceptively advertising three of its misleading "promotions," which drew Plaintiffs onto its platform in the first place.

7.     First, DraftKings advertised the chance for Plaintiffs to place bets at no risk to them ("Risk-Free Bet" or "No Sweat First Bet").

8.     These purportedly "Risk-Free" bets, however, are not as advertised. The terms of the no-risk bet promotions required Plaintiffs to bet with their own money, but, if they lost, they were not given their money back. Instead, their accounts were credited with an expiring "Bonus Bet" rather than U.S. dollars in the amount the user initially wagered.

9.     These "Bonus Bets" did not make Plaintiffs whole because "Bonus Bets" cannot be withdrawn for cash. Instead, they must be both wagered and won before they have any cash value.

10.     Furthermore, wagers made with Bonus Bets are not paid out like wagers made with U.S. dollars because customers do not get back the "stake": A winning $100 bet made with

U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of ~9%, which results in a payment of approximately $191. By contrast, a winning bet made with a $100 Bonus Bet pays only the winnings minus the vig—$91.

11.    The Bonus Bet is thus worth significantly less than the initial bet, meaning that the money the Plaintiffs were induced to deposit was never in fact "risk-free" as advertised.

12.    Regulators across the country have taken issue with DraftKings's use of language implying that customers can place a bet without risk. While DraftKings has tweaked its advertising in response to these concerns, it continues to falsely imply that certain bets can be placed at no risk to customers by opting into a "No Sweat Bet" promotion.

13.    Second, advertising for DraftKings's Casino Deposit Match Promotion promised Plaintiffs, in clear and uniform words, that DraftKings would match up to a $2,000 deposit of funds into its casino.

14.    While promising a "100% deposit match," advertising for this promotion entirely fails to alert customers about the counterintuitive way the promotion actually works: as soon as you opt-in and wager your deposit you must "play through" twenty to thirty times the amount you initially deposited (during the course of which, you are likely to lose your entire deposit) or you will lose all the funds tied up in the bonus (including your initial deposit) anyway at the end of seven days, even if you never lose a bet.

15.    In reality, using this promotion ends in only one of two ways: users either lose their initial deposit because they are unable or unwilling to satisfy the 20-30x time-sensitive play-through requirements that are only made clear to users after they begin the promotion, or they place so many bets chasing the playthrough requirements that they end up losing all or

most of their initial deposit.

16.     On information and belief, over 80% of users lose their entire initial deposit the first time they opt into a Casino Deposit Match Promotion.

17.     Plaintiffs each opted into the Casino Deposit Match Promotions without knowing about the onerous and confusing playthrough requirements, which were only fully communicated in opaque language in blocks of fine print and did not accompany the ads Plaintiffs saw. As a result, Plaintiffs lost all the money they deposited either by gambling it away attempting to satisfy the promotion or by failing to satisfy the undisclosed playthrough requirement and losing their deposit at the expiration of seven days.

18.     On July 10, 2025, the Connecticut Department of Consumer Protection announced that DraftKings had agreed to return millions of dollars to Connecticut consumers who used the Casino Deposit Match Promotion.[1]

19.     DraftKings also agreed to cease advertising the Casino Deposit Match Promotion and promotions like it in Connecticut unless it more conspicuously disclosed the playthrough requirements and the time within which a customer must meet them.

20.     Third, Plaintiff Youngs was deceived by DraftKings advertisements offering a "Deposit Bonus up to $1,000" for new sportsbook users. This promotion, too, misleadingly implied that new users would receive, at least, a dollar-for-dollar match of their first sportsbook deposit.

21.     But, in order to receive the promised deposit bonus of $1,000, users have to deposit five times that amount and then bet twenty-five times that amount on long-shot bets all

---

[1] Available at: https://portal.ct.gov/dcp/-/media/dcp/gaming/pdfs/final-avc-draft-kings-2025.pdf?rev=d9312bcf734b4e1fa32e9791f7139d02&hash=93331C76D6D4A9C0C9D48A310E65F0D7 (last accessed: July 15, 2025).

within a limited period of time. Even then, and even if they win, customers do not actually receive a cash match of their deposit as the promotion states. Instead, they receive "DK Dollars" equal to their deposit amount. Like "Bonus Bets," "DK Dollars" are not redeemable for cash and must be wagered and won before they have any value.

## **PARTIES**

22.    Plaintiff Matthew Youngs is a resident of New Jersey residing in Little Falls. Plaintiff Youngs began using DraftKings in 2016. He began using DraftKings's sportsbook in 2018 and its online casino sometime in 2022.

23.    Plaintiff Charles Thompson is a resident of New Jersey living in Ventnor City. Plaintiff Thompson began using DraftKings in the summer of 2020 after seeing advertisements for deposit match and "Risk-Free" promotions on television and hearing advertisements for DraftKings on the radio and music streaming platforms.

24.    Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2023, DraftKings is a publicly traded company that trades on the Nasdaq Stock Exchange.

25.    Defendant Crown NJ Gaming Inc. is a privately held company incorporated in Delaware with its principal place of business in Boston, Massachusetts. Crown NJ Gaming, Inc. is a subsidiary of DraftKings and is responsible for conducting some portion of DraftKings's business in New Jersey.

## **JURISDICTION AND VENUE**

26.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because, given the number of DraftKings's users and the prevalence of the promotions and practices at issue, the matter in controversy exceeds $5,000,000, exclusive of

interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendants. The number of members of the proposed class in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

27.    This Court has personal jurisdiction over Defendants because they regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and/or services provided to persons in this District.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant does business in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.  DraftKings's No-Risk Promotions

29.    DraftKings runs a variety of promotions that falsely state users can place a sports bet without any risk of losing money. The dollar amount that can be placed "Risk-Free" or "No Sweat" varies but can be as much as $1,000.

30.    Advertisements for these No-Risk Promotions all include the misleading statement that a bet can be placed "Risk-Free" or "No Sweat" up to a certain amount of money. This is misleading because when customers place a bet pursuant to this promotion they are actually at significant risk of losing some or all of the money they bet.

31.    Since at least 2020, DraftKings has advertised No-Risk Promotions with these misleading statements to countless people watching professional and collegiate sports on television.

32.    Even for those not watching televised sports, DraftKings ads for no-risk promotions were inescapable on New Jersey highways and public transportation.

33.    DraftKings has also advertised risk-free betting on the Twitter, Instagram, Facebook, and TikTok feeds of millions of potential users—including Plaintiffs—through direct advertising and paid partnerships with influencers.



*Figure 4: Post on Twitter (now X) from user @SoManyWays2Joey (host of a popular NHL podcast on a network partnered with DraftKings) advertising a "Risk-Free Bet" up to $1,000; dated July 14, 2022. (*https://x.com/SoManyWays2Joey/status/1547647893254746116*)*

34.    Plaintiffs Youngs and Thompson all saw many advertisements containing the misleading "Risk-Free Bet" or "No Sweat Bet" statements.

35.    Plaintiffs cannot recall every word contained in the advertisements they saw, but they do not recall ever seeing the terms described below either in the advertisements or on DraftKings app before using a No-Risk Promotion for the first time.

36.    Plaintiff Youngs saw numerous advertisements in early 2020, primarily in the DraftKings app, telling him he could place a bet "Risk-Free" on DraftKings. Relying on the representations in DraftKings's advertisements, Plaintiff Youngs opted in and placed a bet that he believed was without risk to him. On at least one occasion, Plaintiff Youngs lost his entire stake and was surprised when he recouped nothing from the bet.

37.    Plaintiff Youngs was able to opt in and place "Risk-Free" bets without ever

seeing the full terms of the promotion or being informed that there were terms that contradicted the "risk-free" promise.

38.     Plaintiff Thompson learned about "Risk-Free" bets during the summer of 2020, when he saw and heard advertisements for the promotion on local television, local radio, and music streaming services Spotify and Pandora. Plaintiff Thompson opted into a "Risk-Free" bet promotion shortly thereafter.

39.     Nowhere in the advertisements he saw or in the promotion's opt-in process was Plaintiff Thompson shown the full terms of the promotion in readable print.

40.     The first time he lost a "Risk-Free Bet", Plaintiff Thompson was surprised when, instead of being returned to his original position and receiving a cash refund to his account, he received an expiring "bonus bet" with no cash value.

41.     As Plaintiffs' experiences demonstrate, the bets placed pursuant to these promotions involve substantially more risk than DraftKings's promotional materials lead customers to believe. When a customer loses their initial bet, they are not in the same position as they were before placing the wager.

42.     DraftKings's advertising misleadingly implied the contrary and concealed several key features of the no risk promotion that would have allowed customers to determine that using the promotions did, in fact, put them at risk of losing their money.

43.     First, DraftKings misrepresented that a user could place a bet at no risk to themselves when there was necessarily risk, because a consumer cannot simply cash out a refund if they lose, but instead must place another bet (the so-called "Bonus Bet") that they receive in the event they lost their original wager.

44.     Second, and more deceptively, DraftKings misleadingly implied that a user

8

could be restored to their original position if their original bet lost because they would receive a "Bonus Bet."

45.     When a user places a bet as part of a no-risk promotion, they are wagering their own money and their account is debited the amount of the bet in U.S. dollars (in this case $100). If they lose, that money is not credited back to their account (as it would be if the bet was actually without risk). Instead they are given a "Bonus Bet" of the same amount. But DraftKings consistently fails to disclose that a "Bonus Bet" is not the same as its cash equivalent.

46.     "Bonus Bets" have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn from the account.

47.     In order to turn a "Bonus Bet" into U.S. dollars that can make a user whole for their prior loss, the customer must use the "Bonus Bet" to place an additional wager within a specified time limit and win.

48.     But even if the customer places that bet and wins, they are not in the same position they would have been in if they would have won that bet with their original cash deposit. When a customer places and wins a "Bonus Bet", they do not receive the stake back— which is what DraftKings purportedly gave them to make up for their loss. For example, if a customer uses a $100 "Bonus Bet" on a winning wager with 50/50 odds, they are paid out $91 ($100 winnings, minus 9% vig, without a return of the $100 stake).

49.     And of course, there is no guarantee that a user will win the "Bonus Bet". If a "Bonus Bet" loses, the user will be paid out nothing.

50.     DraftKings thus misrepresented that there was no risk because there is the risk of losing all the money originally wagered. If a user loses their "Bonus Bet," they have no further

means of recouping the initial amount they wagered.

51.    The false promise of "Risk-Free" and "No Sweat" bets was strategically and misleadingly designed to overcome gambling-naïve customers' skepticism of gambling.

52.    DraftKings was aware of the effects of such promises on new customers'—including Plaintiffs'—thinking: "If it's no-risk, why not bet more?"

53.    DraftKings deliberately tricked customers in New Jersey into falling for these promotions by not clearly communicating that those signing up for the no-risk promotions were, in fact, at risk of losing their money.

54.    Customers relying on their commonsense understanding of the "Risk Free" and "No Sweat" offer on promotional materials—and not understanding the complex terms laid out several layers deep in fine print that contradict DraftKings's large-print promises—were surprised to discover upon losing their bets that, in order to get some of their money back, they needed to make an additional, successful wager.

55.    DraftKings supplemented this confusion by using the dollar symbol ($) in its promotional materials, thereby implying that it was not just the bet that was without risk, but a specific sum of money that Plaintiffs were using to place the bet.

56.    DraftKings also makes it very hard to find and comprehend the terms of No-Risk Promotions before opting into them in the app.

57.    First, the link to the full terms of the promotion are not even made available to a user until after the customer has already logged into the platform in response to an off-platform advertisement for the promotion and clicked through several steps to get to the point of placing the supposedly no-risk bet.

58.    Even then, DraftKings buries the most important term—that if you lose your

original bet, you only get an expiring "Bonus Bet" back which is not treated like a normal bet in how it is paid out. This vital information—which contradicts the large print promises that the customer is not at risk if they lose—only appears behind a tiny, hyperlinked information symbol and then, if the symbol is clicked, deep in very small text below several blocks of much larger text focusing on other aspects of the promotion.



*Figure 5: Screenshot taken November 11, 2024, of the DraftKings app for placing a "No Sweat" bet. No terms and conditions are displayed. Instead, they are obscured by an easy-to-miss hyperlink, seen here as the almost imperceptible "i" with a small green circle around it next to "NBA No Sweat SGP or SGPx"*

59.    A user need not—and Plaintiffs did not—ever see the full terms before opting into the promotion on the basis of DraftKings's advertising that led them to believe they could

place a bet with no risk.

60.    On information and belief, Plaintiffs opted into the promotion and placed "risk-free" bets by flipping a green switch in the app like the one shown above without ever clicking the tiny "i" symbol that linked to the terms.

61.    Even when a user does click through to the terms, they still do not clearly convey why the bet is not without risk because the full terms bury the lead: all you get back if you bet loses is an expiring bonus bet that is not paid out like a normal bet.



11:13

years of age or older (18+ if in DC/KY/NH/WY) (19+ if in CA-ONT). Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gambling, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

In addition to the eligibility requirements set forth above and in the DraftKings Terms of Use, to participate in the Promotion, customers must (1) be a registered DraftKings Sportsbook customer with an active account; (2) receive an offer to participate in this Promotion; and (3) opt-in by clicking on the appropriate link or button within the Promotional Period.

**NO SWEAT BET REDEMPTION**

Upon completion of the promotion requirements, eligible customers will be awarded one (1) No Sweat Bet (the "Token"). Token valid only on 11/27 NBA bets (the "Qualifying Bet"). Minimum odds per leg of -500 or longer. Cashed-out bets and voided bets will void this Promotion. Bets placed with bonus rewards (including but not limited to Bonus Bets, Odds Boosts/Surges, Profit Boosts, etc.) are not valid. Token expires at the conclusion of the final 11/27 NBA game. Qualifying Bet must be placed using cash from your cash balance or DK Dollars. Maximum reward limits apply and vary by customer cohort. Maximum reward limits will be clearly and conspicuously disclosed to the customer upon opting in.

No Sweat Bet Tokens are single-use, non-withdrawable, and have no cash value. Must meet Qualifying Bet criteria and select Token BEFORE placing Qualifying Bet. Token only applies to Qualifying Bet. Reward issued only if Qualifying Bet loses after applying Token. Reward issued as Bonus Bet(s) based on the amount of losing Qualifying Bet. No Sweat Bet may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

**REWARD LIMITATIONS**

Bonus Bets are single-use, non-transferable, non-withdrawable, and have no cash value. Bonus Bets are valid for seven (7) days (168 hours) from the time they are credited to customers' accounts. Customers can choose when to use Bonus Bets and must select the Bonus Bet in their betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and

11:13

betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and wins, only the profit of $10 will be credited to the customer's account. Bonus Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

**GENERAL TERMS**

Limit one (1) offer per customer. Customers must opt-in to this Promotion each time it is offered. Opting-in to this Promotion during a single day is only valid during that day and does not opt the customer into future periods. See DraftKings Sportsbook Terms of Use for information and limitations on wagering. Each customer will be notified when they have received an award by (1) a bell notification (this is a notification that displays as a bell icon on the home page of the DraftKings Sportsbook app and website that can be clicked on to view short confirmation copy and terms) and/or (2) an automatically triggered email if the customer successfully entered the promotion and completed the promotion requirements. Whether a customer has committed abuse of this Promotion, violated the Promotion Terms or DraftKings Terms of Use, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. Should you wish to cancel your participation in this promotion at any time, please contact customer experience at sportsbook@draftkings.com. Upon cancellation, you may withdraw any remaining funds deposited in connection with this promotion subject to DraftKings Terms of Use. Any wager placed on DraftKings Sportsbook in connection with the promotion cannot be rescinded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the terms and conditions of this Promotion. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings account holders are responsible for any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors in bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Promotion Terms or DraftKings Terms of Use, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or



*Figure 6: The full terms of use for the promotion pictured in Figure 5. If a user navigates to these terms through the obscured hyperlink, they are met with an impractically small font size.*

62.     Regulators are increasingly catching on to the misleading language DraftKings and other sportsbooks use in advertising "risk-free" bets. Several illustrative examples are discussed below.

63.     In Ohio, gambling regulators have said such "free" or "risk-free" inducements are "false, misleading and explicitly against" state law. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions isn't good enough, he added. "We are not

supportive of trying to put the truth in small print."[2]

64.    DraftKings was sent a notice of violation by the Ohio Casino Control Commission which included a penalty of $150,000 for the use of "Risk-Free Bet" language. Previously, DraftKings had received a notice of violation from the same commission for advertising to individuals under the age of twenty-one.

65.    In 2022, the New York Attorney General's office admonished: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness."[3]

66.    The Massachusetts Gaming Commission prohibits sportsbooks from running promotions advertised as "free" or "risk-free" if a bettor needs to risk their own money as part of the promotion. *See* 205 Mass. Code Regs. § 256.04. Colorado has imposed a similar prohibition. *See* 1 Colo. Code Regs. § 207-2:9.4

67.    Even the NBA took a stance on the "risk-free" language, banning it on platforms operated by the NBA or its franchises in February of 2023.[4]

68.    DraftKings started to quietly move away from explicit "risk-free" language in late 2022. In that year, DraftKings pivoted to labeling many of these offers "No Sweat" bets.

---

[2] Danny Funt, *Sportsbooks call them risk-free bets. Just don't read the fine print.*, WASHINGTON POST, Dec. 26, 2022, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/ (last visited Nov. 17, 2024).

[3] *CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl*, NEW YORK ATTORNEY GENERAL, Feb. 10, 2022, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became,strings%20attached%20without%20consumers%20awareness (last visited Nov. 17, 2024).

[4] Bill King, *Concerned about betting's inherent dangers, NBA to ban 'risk free' advertising*, SPORTS BUSINESS JOURNAL, Feb. 6, 2023 https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Upfront/betting.aspx (last accessed Nov. 21, 2024).

These promotions are materially no different, and just as misleading, as their "Risk-Free" predecessors, particularly considering that consumers in New Jersey still associate these offers, however labeled, with the "Risk-Free" promotion campaigns that were incessantly advertised previously.

69.     According to a Washington Post article, industry participants admitted publicly that advertising offers as no-risk was "unclear".

70.     Nevertheless, DraftKings continued to make these offers because it expected and intended consumers to be misled by its "Risk-Free" and "No Sweat" promotions.

71.     Even in the last year, advertisements for DraftKings's No-Risk Promotions have continued to advertise "Risk-Free Bets" without disclosing any material terms.



*Figure 7: Advertisement for "Risk-Free Bet" appearing on DraftKings affiliate marketing websites in March 2025.*

72.     In response to the outcry regarding this Promotion from regulators and others, in 2024, DraftKings did begin including disclosures regarding some of the terms of No-Risk Promotions in some ads. It did not do so in every ad, however, and it only presented the terms in hard-to-read, very small print, which did not dispel the overall impression created by the advertisement that customers could place a bet up to a certain amount of money without risk.

73.     As described above, Plaintiffs Youngs and Thompson were misled by DraftKings's advertisements into thinking that they could bet without risk and then ended up losing their initial stake.

74.     Had Plaintiffs Youngs and Thompson, and Class Members understood the true risk inherent in making these "risk-free bets," they would have acted differently and not placed bets in response to these promotions.

**B.  DraftKings's Casino Deposit Match Promotion**

75.     Plaintiffs saw ads for DraftKings's Casino Deposit Match Promotion, which promised uniformly in simple terms, that they would receive a 100% match of their deposit of up to $2,000 into the DraftKings casino.

76.     The specific information that each Plaintiff saw will be described below, but DraftKings's advertisements for the Casino Deposit Match Promotion all center around an eye-catching promise in large print of a "100% Deposit Bonus" or "100% Deposit Match" up to a certain amount of money, usually "$2,000." This is misleading because customers are very unlikely to receive the full deposit match and often lose even their initial deposit due to the insufficiently disclosed terms of the promotion that were not mentioned in the advertisements that ran when Plaintiffs first used the Casino Deposit Match Promotion.

77.     Based on the Connecticut Division of Consumer Protection's investigation into the Casino Deposit Match Promotion, 80% users lose their initial deposit after opting into the promotion. It is likely this number is higher the first time users opt into the promotion.



*Figure 1: example advertisement for the Casino Deposit Match Promotion promulgated on digital media in New Jersey and in the DraftKings app itself.*

78.    Plaintiff Youngs first used the Casino Deposit Match Promotion in late 2022 or early 2023, making a deposit of around $500 because he believed, based on ads he saw which are described in further detail below, that DraftKings would match 100% of this money.

79.    Plaintiff Youngs lost his entire initial deposit while he was attempting to satisfy the playthrough requirement, which he only learned about after opting into the promotion and placing his first bet. Upon discovering that the bonus funds were not released to him, he investigated further and realized he had to place a large number of bets in a short period of time to get the bonus funds. In attempting to do so, like many other DraftKings Casino customers, he lost everything he had initially deposited.

80.    Thus, rather than getting his deposit "matched," Plaintiff Youngs lost his deposit as a result of the promotion.

81.    Plaintiff Youngs saw and heard ads for this promotion in a variety of mediums including on Facebook, in the DraftKings app, and on TV in late 2022 and early 2023, shortly before he first used the Casino Deposit Match Promotion. All the ads Plaintiff Youngs saw uniformly promised a "100% deposit match" up to a certain amount of money (displayed with a dollar sign). None of the ads conspicuously disclosed any of the terms, described below, that make it exceedingly unlikely for a customer to actually receive the promised cash match and

put them at risk of losing their initial deposit.

82.    One television advertisement for the promotion, which Plaintiff Youngs recalls seeing, ran in January 2023 and promised customers a "100% deposit match up to $2,000" for playing blackjack on DraftKings's online casino without audibly disclosing the existence of a playthrough requirement or the fact that blackjack contributes towards the requirement at only a 20% rate (as described below). Some, but not all, of the terms associated with the promotion were shown in tiny font at the bottom of the screen for the last five seconds of the advertisement, but were too small and disappeared too quickly to be read in full.[5]

83.    Plaintiff Youngs recalls that sometime in late 2022 or January 2023, after seeing many ads for the Casino Deposit Match Promotion promising a "100% Deposit Match" without mentioning anything about playthrough requirements, he clicked on a "PLAY NOW" button in a banner like the one below, advertising the Promotion in the DraftKings app, and was taken to a page where he could make a deposit.



*Figure 2: Example advertisement for the Casino Deposit Match Promotion substantially similar (in terms of language and lack of terms) to those seen by Plaintiffs before they first opted in to DraftKings's Casino Deposit Match Promotions.*

84.    Plaintiff Youngs does not recall the page where he made the deposit containing

---

[5] Available at: https://www.ispot.tv/ad/23_E/draftkings-casino-home-of-blackjack (last accessed July 15, 2025).

any description of the playthrough requirements or the risk of losing his deposit if he did not complete it within seven days.

85.     Plaintiff Thompson recalls seeing and hearing ads for the Casino Deposit Match Promotion on television and on music streaming platforms Spotify and Pandora around the time he first opted in to the promotion in 2020. Although Thompson cannot recall every detail of the advertisement, he remembers that the ad promised a "100% deposit match."

86.     When Plaintiff Thompson navigated to the DraftKings mobile app, he saw another advertisement for the Casino Deposit Match Promotion on the home page, which he clicked on and used to deposit around $750 into his account.

87.     As described below, Plaintiff Thompson was unable to complete the promotion's 10x playthrough requirement within seven days, and was shocked when his DraftKings balance, including his $750 deposit, was reset to zero.

88.     The full terms of the promotion, which (if presented in understandable language) would have told him that he was at risk of forfeiting his entire initial deposit by failing to complete the playthrough, were never presented to Plaintiff Thompson during the promotion's opt-in process, or in the advertisements he saw and heard on television, radio, Spotify, and Pandora.

89.     Had Plaintiff Thompson seen the full terms of the promotion and understood that he would be required to wager 10x the combined amount of his deposit and bonus funds in seven days, and that failure to do so would result in forfeiting his initial deposit, he would have never opted into the promotion.

90.     All of DraftKings's digital and television advertisements for the Casino Deposit Match Promotion fail to communicate the true lengths to which a user must go to receive the

promised matching funds and the fact that a user's entire deposit will be forfeited should they fail to meet these Promotion's hidden and confusing requirements.

91.     A reasonable expectation, especially for new users, is that failure to satisfy the requirements would result in a user's account being reset to the amount of their initial deposit, plus or minus any gambling wins or losses, sacrificing only the opportunity to get the matching bonus. DraftKings users could not reasonably be expected to understand based on the ads DraftKings ran or the opt-in process that by using the Casino Deposit Match Promotion they risked losing their entire initial deposit, particularly when their account balance reflected a single dollar amount and was not represented as separate "pools" of money to be treated differently.

92.     The Promotion is subject to egregious playthrough requirements, which vary between 10x and 15x of the combined amount of the deposit and bonus funds. What this means is that, to get a $2,000 deposit matched, assuming the low-end 10x playthrough requirement, a user would need to wager at least $40,000 (10x playthrough of BOTH the $2,000 deposit and the $2,000 bonus).

93.     Additionally, these promotions have a seven-day window for users to satisfy the playthrough requirements.

94.     Accounting for this, a user would have to wager over $5,700 every day for a week to satisfy the $2,000 bonus playthrough requirement.

95.     DraftKings further manipulates the terms such that not all wagers contribute equally to the playthrough requirement. In fact, casino games with the most favorable statistical returns to users, like table games, contribute to the playthrough requirements at rates significantly lower than other casino games where users have a much lower chance of winning,

like online slot machines. For example, blackjack contributes towards the playthrough requirement at a rate of just 20%. In other words, if a user bet $100 on a hand of blackjack, only $20 would count towards their playthrough requirement.

96.    For a user to satisfy a $2,000 deposit match with a $40,000 playthrough requirement playing just blackjack, they have to gamble a minimum of $200,000 in a seven-day timeframe.

97.    Assuming a hand of blackjack takes ~1 minute, a user betting $50 every hand would have to spend more than 66 hours in a 7-day period playing blackjack to satisfy the playthrough requirement. That amounts to almost ten hours of blackjack a day.

98.    The fact that users must spend a tremendous amount of time gambling in a short timespan is an intentional aspect of the promotions' design. DraftKings intends for customers to spend enough time engaging in habit-forming gambling behavior that they do, in fact, form a habit.

99.    The hard-to-understand terms and conditions further specify that "Order of Funds for wagering [are]: (1) customer's initial qualifying deposited funds (the Original Deposit) are wagered first prior to casino bonus funds, (2) winnings accrued during the play-through of the Original Deposit, (3) bonus amount." This language is unclear, but DraftKings seems to interpret it to mean that a user has to play-through (and eventually lose) anything they have won beyond the amount of their initial deposit after first satisfying their initial deposit play-through requirement, before they can access the bonus funds.

100.    The "order of funds for wagering" provision is paired with language that states, "Failure to complete the play-through requirement, defined below, of the Original Deposit and Casino Bonus Funds within seven (7) days (the "Play-through Period") of the Casino Bonus

Funds being credited to your account will void the award. This will result in forfeiture of any wagered and lost portion of the Original Deposit, Casino Bonus Funds and any accumulated winnings."

101.    Even parsing this final sentence carefully, no reasonable consumer would expect "accumulated winnings" to include the stake of the original bet, which is not "winnings," its just money that the bettor didn't lose. It's the same money that the bettor first deposited with DraftKings and did not lose in a bet. Nevertheless, DraftKings treats that money as "accumulated winnings" and takes it too if the customers fails to satisfy the full playthrough requirements.

102.    In practice this means that, if a user deposited $2,000 and wagered it to win, say, $500 additional dollars before deciding that they cannot satisfy the $40,000 playthrough requirement, their account balance would be reset to $0 because DraftKings would keep their $2,000 deposit, as well as the $500 actual winnings.

103.    Even if a user went on a hot streak and won $25,000 with their initial $2,000 deposit, they would *still* end up with nothing—not even the original $2,000 they put in—if they failed to complete the entire playthrough at the end of seven days.

104.    DraftKings adds to the confusion by including in the terms, in bold, the statement that "At any point, a customer may decide to forfeit their bonus and remove themselves from the promotion." But DraftKings fails to clearly explain to users that "forfeit[ing]" their bonus will not leave them any better off than just allowing the promotion to expire—or deleting the app and never returning—because once they bet their initial deposit, no matter how much money remains in their account, DraftKings treats all the funds as forfeitable if the playthrough is not met.

105.    DraftKings knew, or should have known, that its customers would not know about or understand that these terms limited the promotion's large-print promise of a "100% deposit match."

106.    Even when DraftKings's advertisements for the promotion did include some terms, they were in very small, often unreadable print and did not include these most important terms that make the "100% deposit match" promise so deceptive.



*Figure 3: Another example advertisement for the Casino Deposit Match Promotion with the full terms obscured, promulgated on digital media throughout New Jersey in January 2022.*

107.    On information and belief, until very recently the partially hidden small-print terms in Figure 3 is the most advertisements for the DraftKings Casino Deposit Match Promotion disclosed about the terms of the promotion.

108.    Plaintiffs Youngs and Thompson do not recall ever seeing anything about the playthrough requirement before they opted-into the Promotion and are certain that the full terms of the promotion were not fully included in the ads that first brought the Promotion to their attention and first led them to use it to make a deposit.

109.    This expectation is particularly reasonable because it is consistent with how DraftKings's sportsbook deposit match promotions work. Under the Sportsbook Deposit Bonus Promotion, described below, a user is progressively given bonus funds as they satisfy the playthrough requirement and can opt out at any time. A DraftKings user who was first deceived by DraftKings's Sportsbook Deposit Bonus Promotions and then thinks they have an understanding of how DraftKings's deposit match promotions work would be deceived again by the Casino Deposit Match Promotion when they opt into it thinking it will operate like the sportsbook promotion.

110.    When users discover that their deposit has been locked up in the Casino Deposit Match Promotion simply by placing a single bet in the casino, they are faced with either trying to recoup it by gambling an enormous amount in a short period of time or walking away from it.

111.    One Reddit user posted a detailed description in December 2023 of his experience with a "100% Casino Deposit Match."[6] After depositing $1,000 into DraftKings and playing hundreds of hands of blackjack, this user decided that the requirements were too onerous to complete, particularly given the negligible contribution of his blackjack playing to the playthrough. Deciding he was not willing to wager $100,000 on blackjack in just seven days, this user navigated to the "bonus forfeiture" option. Without being asked to confirm or warned that he would be losing his entire initial deposit, this user's account balance was reset to zero. Due to DraftKings's deceptive advertising, the user was shocked that "forfeiture" of the bonus included not just the promotional incentives and associated winnings, but his original $1,000 deposit.

---

[6] https://www.reddit.com/r/DraftKingsDiscussion/comments/18uj96p/bonus_forfeiture/

112.     A number of complaints to the Better Business Bureau reflect identical concerns about unknowingly forfeiting deposits associated with DraftKings's "Casino Deposit Match" promotions.[7] Other complaints to the Better Business Bureau reflect customers' confusion surrounding the varying contributions of different games to the playthrough and uncertainty about the meaning of a "15x playthrough."

113.     Many individuals have reported this promotion to state gambling regulators.

114.     Plaintiffs Youngs and Thompson each saw numerous advertisements for this promotion that included large-print promises of a "100% deposit match" but did not advise them of the confusing terms of the promotion described above.

115.     Plaintiffs Youngs and Thompson each relied on the key misleading representation of these advertisements: that they would receive 100% of their DraftKings casino deposit matched. Had they known the truth, they would not have used the promotion in the first place.

**C.  DraftKings's $1,000 Sportsbook deposit match promotions**

116.     DraftKings also offer a deposit match promotion on its sportsbook. DraftKings's advertising for this promotion promises $1,000 to new customers that sign up for its online sportsbook (the "Sportsbook Deposit Bonus Promotion").

117.     Since at least 2020, DraftKings's advertisements have promised a "$1,000 Sign Up Bonus" to countless New Jersians watching televised sports and on the Twitter, Instagram, Facebook, and TikTok feeds of millions more.

118.     DraftKings also advertised sign-up bonuses on billboards and public transportation in New Jersey.

---

[7] https://www.bbb.org/us/ma/boston/profile/online-gaming/draftkings-inc-0021-134635/complaints

119.    Through July 15, 2025, the top banner on DraftKings's website reads:



*Figure 8: Screen Capture from DraftKings's Website on June 21, 2023 (https://web.archive.org/web/20230621141013/https://sportsbook.draftkings.com/featured)*

120.    Likewise, any user who downloaded the DraftKings app in 2023 was met with the following offer:



*Figure 9: Screen Capture of first page user saw in 2023 upon opening DraftKings's app.*

121.    DraftKings also ran TV advertisements for this promotion that promised new customers "a deposit bonus up to $1,000" and only disclosed the playthrough requirements associated with the Promotion in very small print at the bottom of the screen, visible only for the last four seconds of the advertisement.[8]

---

[8] https://www.ispot.tv/ad/O534/draftkings-sportsbook-deposit-bonus-1000 (last accessed July 30, 2025).

122.    Plaintiff Youngs saw advertisements containing misleading statements promising $1,000 for making a deposit on DraftKings's sportsbook.

123.    As with the advertisements for No-Risk Bet and Casino Deposit Match Promotion, the terms of the $1,000 Sportsbook Deposit Promotion are not fully disclosed in the advertisements and, to the extent that they are communicated, appear only in an illegibly small font-size—an order of magnitude smaller than the misleading text advertising the promotion—and are confusingly worded.

124.    Plaintiff Youngs recalls seeing television and digital ads for the DraftKings Sportsbook that mentioned a deposit bonus in January of 2020, shortly before he created and funded his account in January or February of 2020.

125.    Plaintiff Youngs cannot recall exactly what all of these ads looked like, but he does recall that they each contained the promise of a "$1,000 Deposit Bonus" and does not recall them containing any warning that only 20% of his deposit would be matched, that there is an onerous playthrough required to receive the match, or that his deposit would be matched, if at all, in "DK dollars," which have no cash value.

126.    On information and belief, Plaintiff Youngs also saw the statement "Get a $1,000 Deposit Bonus" on the signup page of the DraftKings app, when he first downloaded it in 2020. This page neither disclosed nor linked to the terms of the promotion.

127.    Plaintiff Youngs believed, based on the promise of a "$1,000 Deposit Bonus," that he would at least receive his initial deposit matched in cash once he created and funded his account.

128.    Plaintiff Youngs does not recall ever being informed during the account creation or deposit process that only 20% of his deposit would be matched, that there was a lengthy

playthrough requirement, or the fact that his deposit would be matched, if at all, in DK dollars.

129.    Plaintiff Youngs relied on and was deceived by the misleading statements in these advertisements and as a result he created and funded his account, based on the belief that his first deposit would be matched.

130.    The unfair and deceptive terms of this promotion, which DraftKings offers to this day, make it inordinately unlikely for a customer to obtain the advertised $1,000 bonus. Omitted from the promising headline is the reality that DraftKings will only match 20% of a user's deposit and will only award one non-withdrawable site credit for every $25 that the customer wagers.

131.    In plain terms—which the fine print regarding this promotion deliberately obscures and the large-print advertisements for this promotion completely misrepresent—in order for a user to get a $1,000 bonus, they actually need to make an initial deposit of $5,000 in one lump sum (i.e. 5x the promised $1,000), and then risk $25,000 (i.e. 25x the initial deposit) on DraftKings sports bets within 90 days.

132.    Additionally, to satisfy the playthrough requirement, DraftKings requires that customers make wagers on bets with minimum odds of -300 (meaning a bettor must risk $300 to win $100). This means bettors must place a series of highly-risky bets to satisfy the playthrough requirements.

133.    None of the foregoing was disclosed to Plaintiffs Youngs in the advertisements he saw for the Sportsbook Deposit.

134.    A new user is statistically likely, even using the most conservative betting approach, to lose money trying to satisfy the playthrough requirements.

135.    But even if they make it through all those steps, the $1,000 bonus is not

rewarded as withdrawable cash funds, but rather as site credits (i.e. "DK Dollars") that hold no cash value, are non-withdrawable, non-transferable, non-refundable, and can only be used for further gambling.

136.    DraftKings's advertising of the $1,000 Sportsbook Deposit Promotion is also unfair and deceptive because an eligible consumer, who is often a new participant in sports betting, would be unlikely to understand the cost and risk involved in obtaining the $1,000 bonus.

137.    Plaintiff Youngs was misled by the advertising for the Promotion and, as a result, deposited more money than he would have with DraftKings had he been informed of the actual terms of the promotion.

138.    The result was that Plaintiff Youngs gambled and lost more money than he otherwise would have.

139.    Plaintiff Youngs and many other customers transferred money into their DraftKings accounts anticipating that their deposit would be "matched" in full up to $1,000.

140.    Plaintiff Youngs never became aware that there were additional terms, much less saw the full terms of the promotion or learned that their funds would not be matched in U.S. Dollars, not be matched on a 1:1 basis, and would only be matched at a rate of one "DK Dollar" for every $25 USD wagered, until after they had made their deposits and opted into the promotion.

141.    Thus, in order to actually obtain the promised $1,000, customers would then have to go through the additional step of placing even more sportsbook wagers and hope that they would win enough of those wagers to accrue $1,000 in their account—something that they were statistically unlikely to do.

142.   Plaintiff Youngs and other DraftKings customers did not understand, and could not reasonably have been expected to understand from the face of DraftKings's advertisements that, in order to receive a $1,000 bonus, he or she needed to immediately deposit $5,000 because the bonus amount is calculated as 20% of the consumer's first deposit.

143.   Plaintiff Youngs and other DraftKings sportsbook customers did not understand, and could not reasonably have been expected to understand from the face of DraftKings's advertisements that the $1,000 bonus would not be provided at the time of their initial deposit, but that instead they would earn the bonus only one site credit at a time for every $25 wagered. Thus, to receive the $1,000 bonus, the new customer would have to risk $25,000 within 90 days on long-odds bets.

144.   Plaintiff Youngs and other DraftKings sportsbook customers did not understand, and could not reasonably have been expected to understand from the face of DraftKings's advertisements that, in order to place bets for at least $25,000 over 90 days to qualify for the $1,000 bonus, they would have had to wager an average of more than $276 gambling on sports every day for three months.

145.   Plaintiff Youngs and other DraftKings sportsbook customers also did not understand, and could not reasonably have been expected to understand from the face of DraftKings's advertisements, that, despite the advertisements using dollar signs that conveyed that the bonus funds would be in the form of U.S. Dollars, the bonus would actually be awarded only as a non-withdrawable credit ("DK Dollars") to be used for further gambling.

146.   Plaintiff Youngs and other DraftKings sportsbook customers also did not understand, and could not have reasonably been expected to understand from the face of DraftKings's advertisements, that they would be required to make bets with a high level of risk

to satisfy the play-through requirements. They did not and could not have been reasonably expected to understand that not all bets they made on DraftKings Sportsbook would count toward the $1,000 bonus. In fact, any bets that DraftKings's oddsmakers believe have a greater than ~75% chance of winning would not count toward the required total bets of $25,000 within 90 days.

147.    Gambling regulators, like the New York Attorney General, have sounded warning bells about the misleadingness and illegality of deposit match promotions just like the ones DraftKings used on New Jersey residents.

148.    DraftKings knew, or should have known, that its advertisements for this promotion were deceptive to its target customers, who were mostly new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were conveyed clearly and in a font size that a reasonable consumer could be expected to read on the company's advertisements and platform.

149.    DraftKings knowingly and intentionally designed this promotion to maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms.

### D.  DraftKings's Dominant Industry Position Exacerbates the Deceptive Effect of its Promotions

150.    As online gambling has taken off in New Jersey, signs of gambling addictions in the state have skyrocketed.[9]

---

[9] *Wayne Parry, New Jersey loves the money from online sports betting, but fears addictive consequences*, AP, Oct. 24, 2024, https://apnews.com/article/online-gambling-sports-betting-compulsive-new-jersey-20ab0e86ddae2327f47c7ff10bbd27cf (last visited Dec. 17, 2024).

151.    The accessibility and frictionless design of mobile gambling apps makes them particularly dangerous. As one longtime industry participant put it, "America can survive sports betting. It survived illegal betting for years. Whether it can survive a casino on everyone's phone — that I can't answer. That might be the tipping point."[10]

152.    In 2024, DGMB Casino LLC—through which DraftKings partners to operate its internet casino in New Jersey—reported that DraftKings's online casino had earned more than $514 million in revenue.[11] DraftKings made more money than any other online casino in New Jersey last year (without even counting DraftKings subsidiary Golden Nugget Online Gaming's $91 million online casino revenue).

153.    Similarly, in 2024, DraftKings was the second largest sportsbook by revenue in New Jersey. And more dollars were bet on sports in New Jersey in 2024 than in any other state in the nation.

154.    DraftKings reinvests a lot of its revenue in hooking new customers on sports betting. DraftKings's sales and marketing expenses totaled $1.2 billion in 2023.[12] DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads showcased various promotions that DraftKings was running, typically targeting new users and promising bonuses and no-risk bets for signing up and making their first deposit.

155.    DraftKings's brand recognition and market position allows it to exert considerable influence over consumer expectations and industry practices and to get away with

---

[10] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, Rolling Stone, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

[11] https://www.nj.gov/oag/ge/docs/Financials/IGRTaxReturns/2024/December2024.pdf

[12] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%20%202020

practices that smaller, less-established operators could not.

156.     DraftKings also portrays itself as a fair, transparent, and consumer-friendly operator, encouraging users to participate in its promotions and deposit funds into its platform.

157.     In an online gambling marketplace saturated by sign-up promotions targeting vulnerable individuals with big "free" or "risk-free" dollar figures—some of which are truly risk-free and some of which, like those offered by DraftKings, are not—consumer confusion reigns. DraftKings exploits that confusion.

158.     Moreover, DraftKings intentionally designs its marketing and platform interface to minimize the likelihood that users will engage with the terms of promotions.

159.     Consumer psychology research has identified several factors that decrease people's likeliness to read the fine print of consumer contracts, including unreasonably small font sizes, inaccessible language, and terms that are hundreds of words long.[13] Even if a user does labor through DraftKings's confusing, 1,500 word terms, research shows that consumers are often overly optimistic when reading fine print and have "difficulty imagining problems that might arise."[14] In many cases, a user never even sees the promotion's full terms before opting in.

160.     DraftKings exploits these factors and misleads consumers about material aspects

---

[13] Meirav Furth-Matzkin & Roseanna Sommers, *Fool Me Once, Shame On Me: How Consumers And Lawyers Perceive The Fine Print In Deception Cases*, HARVARD JOHN M. OLIN CENTER FOR LAW, ECONOMICS, AND BUSINESS - FELLOWS' DISCUSSION PAPER SERIES, June 2018, https://www.law.harvard.edu/programs/olin_center/felows_papers/pdf/Furth_82.pdf (last visited Dec. 10, 2024); Florencia Marotta-Wurgler, , *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, U. CHI. L. REV., Feb. 6, 2011, https://lawreview.uchicago.edu/sites/default/files/78-1-Increased%20Disclosure%20in%20Software%20Contracts-Marotta-Wurgler.pdf (last visited Dec. 10,2024); Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, NYU JOURNAL OF L. AND BUS., Feb. 9, 2009, https://papers.ssrn.com/-sol3/papers.cfm?abstract_id=1340166 (last visited Dec. 10, 2024).
[14] *See* Stark & Choplin *supra* note 13.

of its promotions, secure in the knowledge that few consumers will notice if the fine print contradicts what they believed they had signed up for.

## CLASS ALLEGATIONS

161.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the following class and subclasses, which is defined as follows:

162.    Casino Deposit Match Promotion Class: Any person who participated in a DraftKings Casino Deposit Match Promotion and lost part or all of their initial deposit or winnings.

a.   New Jersey Subclass: any person in the Casino Deposit Match Promotion Class who entered the promotion while in the State of New Jersey.

163.    No-Risk Promotion Class: Any person who opted into a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their bet.

a.   New Jersey Subclass: any person in the No-Risk Promotion Class who entered the promotion while in the State of New Jersey.

164.    Sportsbook Deposit Bonus Promotion Class: Any person who opened an account and deposited money in response to a DraftKings sportsbook "$1,000 Bonus" promotion for new customers.

a.   New Jersey Subclass: any person in the Sportsbook Deposit Bonus Promotion Class who entered the promotion while in the State of New Jersey.

165.    Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case

and their immediate family members.

166.    The Class Period for each promotion class is tolled to the earliest date of DraftKings's distribution of each of the relevant promotions under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the true terms of its promotions. As described more fully above, Plaintiffs have been misled and injured by the effects of DraftKings's misleading advertisements and promotions.

167.    Alternatively, the Class Period extends from the relevant statutory limitations period for each cause of action through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

168.    This case is properly brought as a class action under Rule 23 for the following reasons:

   a. **Numerosity (Rule 23(a)(1)):** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiff at this time. However, Plaintiff believes there are at least tens of thousands of Class Members. The number and identity of Class Members can be determined through discovery.

   b. **Commonality and Predominance (Rule 23(a)(2)):** Plaintiffs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

       • Whether DraftKings misrepresented in its advertisements that Plaintiffs and the other No-Risk Promotion Class Members would not be at risk

of losing money when they made a deposit and placed a first bet;

- Whether DraftKings intentionally designed its advertisements for the no-risk bet in such a way as to mislead Plaintiffs and the other No-Risk Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings's representations and omissions about the no-risk promotions are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings misrepresented in its advertisements the Sportsbook Bonus it was offering to Plaintiffs and the other Sportsbook Deposit Bonus Promotion Class Members:

- Whether DraftKings misrepresented in its advertisements that Plaintiffs and the other Class Members would receive an amount matching their deposit immediately upon making the deposit for the Sportsbook Deposit Bonus;

- Whether DraftKings intentionally designed its advertisements for these promotion in such a way as to mislead Plaintiffs and the other Class Members in order to induce them to sign up and make more bets than they otherwise would have;

- Whether DraftKings's representations and omissions about the Casino Deposit Match Promotion are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings adequately disclosed the facts and/or risks concerning the use of its Casino Deposit Match Bonus;

- Whether DraftKings's actions violate state statutory law regarding unfair business practices invoked herein;

- Whether DraftKings's actions violate the common law causes of action invoked herein; and

- The appropriate measure of damages to award Plaintiffs and the other Class Members.

- The appropriate injunctive relief to which Plaintiffs and the other Class Members are entitled.

c. **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiffs and each of the other Class Members were injured in the same way by the deceptive promotion at issue. The promotion identified was widely distributed by DraftKings over a long period of time with consistent terms and the promotion that Plaintiffs responded to does not materially differ from promotions that any other Class Member would have responded to. The misrepresentations at issue were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members. Plaintiffs' injury has been caused by the same conduct of DraftKings, which would provide the same basis for a claim for all Class Members.

d. **Adequacy of Representation (Rule 23(a)(4)):** Plaintiffs is an adequate Class representatives because his interests do not conflict with the interests of the other Class Members whom he seeks to represent. Plaintiffs intend to vigorously prosecute this action, and Class Members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel

that is competent and experienced in complex class action and consumer protection and Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

e. **Superiority (Rule 23(b)(3)):** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for each individual Class Member is likely relatively small, and if each Class Member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class Member. This is an appropriate forum in which to litigate these claims, as the New Jersey state population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

f. **Declaratory and Injunctive Relief (Rule 23(b)(2)):** DraftKings acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of New Jersey Consumer Fraud Act—Misleading and Deceptive Advertisements, N.J.S.A. 56:8–1, *et seq.* (Asserted on behalf of New Jersey Casino Deposit Match Promotion Sub-Class)**

169.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

170.    Plaintiffs bring this claim against DraftKings under the New Jersey Consumer Fraud Act, 56:8–1 et seq., individually and on behalf of the New Jersey Sub-Class.

171.    The Consumer Fraud Act declares unlawful "The act, use or employment by any person of any commercial practice that is . . . deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J.S.A. 56:8–2.

172.    DraftKings and co-Defendants are "person[s]" as defined by N.J.S.A. 56:8–1(d).

173.    Plaintiffs, as well as each member of the Class, are "person[s]" as defined by N.J.S.A. 56:8–1(d).

174.    The services and product offered to Plaintiffs and each member of the Class constitutes "merchandise" as defined by N.J.S.A. 56:8–1(c) to include "services or anything offered, directly or indirectly to the public for sale."

175.    Plaintiffs and Class Members are therefore entitled to the protections and remedies provided for by the New Jersey Consumer Fraud Act.

176.    Defendants promulgated false and deceptive promises and misrepresentations in their advertisements for the casino signup deposit match promotion.

177.    Defendants' advertisements suppressed and omitted material facts as to the terms

40

of the promotion, including not including in readable print the terms of the promotions anywhere in advertisements about them. The suppression and omissions were knowing and intentional.

178.    Defendants' conduct also violated New Jersey law because its advertisements affirmatively and falsely represented that consumers were likely to receive a cash-value match of their deposit of as much as $2,000 when, in fact, DraftKings knew it was unlikely that consumers would ever qualify for such a match.

179.    In particular, Defendants engaged in misrepresentation when they failed to include in the advertisement any warning regarding the large play-through requirements for the bonus promotion or any mention of the risk that a consumer's initial deposit would be forfeit if they began but did not complete the promotion.

180.    These advertisements created a likelihood of confusion and misunderstanding among consumers.

181.    These advertisements also violated New Jersey state gambling regulations, which require that "Advertising shall be based upon fact, and shall not be false, deceptive or misleading" and in particular, "no advertising shall: (1) Use any type, size, location, lighting, illustration, graphic depiction or color resulting in the obscuring of any material fact; or (2) Fail to specifically designate any material conditions or limiting factors." N.J. Admin. Code § 13:69C-14.2(d).

182.    These misrepresentations were material because they were likely to deceive reasonable consumers—many of whom were uninitiated in the new industry of online gambling—about the nature of its deposit match offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content,

presentation, and impact upon Plaintiffs and Class Members.

183.    DraftKings intended that Plaintiffs and Class Members be misled by these misrepresentations and omissions.

184.    DraftKings induced Plaintiffs and Class Members to rely on its misrepresentations and omissions to their detriment, when they deposited money, opted into the casino deposit match bonus and began betting on the casino without realizing the consequences of their doing so.

185.    As a result of Defendants' misconduct, Plaintiffs and Class Members suffered ascertainable losses in the form of their deposits towards the promotion and/or unmet matched funds. In light of the foregoing, Defendants violated N.J.S.A. 56:8–1, et seq.

186.    Plaintiffs and Class Members bring this action pursuant to N.J.S.A. 56:8–19 and, in accordance therewith, are entitled to compensatory damages, statutory treble damages in an amount to be determined at the time of trial, attorney fees, and court costs.

## SECOND CAUSE OF ACTION
### Fraud (Asserted on behalf of Casino Deposit Match Promotion Class)

187.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

188.    Plaintiffs bring this claim against DraftKings individually and on behalf of all Class Members.

189.    As described above, Defendants made material misrepresentations regarding the Casino Deposit Match Promotion.

190.    Defendants knew these representations were false and made them intentionally with the intention that users like Plaintiffs and Class Members would rely on them in signing up for the promotion.

191.    These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing a bet in reliance on the promotion.

192.    Plaintiffs and Class Members did rely on these misrepresentations when they deposited money, opted into the casino deposit match bonus and began betting on the casino without realizing the consequences of their doing so.

193.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when making a deposit under the Casino Deposit Match Promotion. Among other things, this reliance was justified because consumers were entitled to understand that a large company in a regulated industry would not make false promises and given the history of gambling companies treating promotions as a loss leader.

194.    As a state licensed betting platform, Defendants knew or should have known that its representations in marketing materials about the promotion were inaccurate and misleading. Defendants had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

195.    Neither Plaintiffs nor any reasonable consumer would have used Defendants' service in the same way if they had known of the true operation and risks of Defendants' service—risks the Defendants alone were aware of and misrepresented.

196.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs and members of the Classes were induced into Defendants' service and have been harmed and suffered actual damages in the amount of unrecouped losses from the loss of their initial deposit.

197.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

### THIRD CAUSE OF ACTION
**Conversion (Asserted on behalf of Casino Deposit Match Promotion Class)**

198.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

199.    Plaintiffs bring this claim against DraftKings individually and on behalf of all Class Members.

200.    Plaintiffs and Class Members' funds were kept segregated in their accounts by DraftKings for the duration of the seven-day playthrough period.

201.    The DraftKings claims gave it the right to take possession of money that a user wagered by did not lose after opting into the Casino Deposit Match Promotion is ambiguous and, in the alternative, unconscionable and unenforceable.

202.    Therefore, Plaintiffs and Class Members were the rightful owners of identifiable sums of money they had won from wagers made either with their initial deposits or funds attributable to wagers made with their initial deposit.

203.    Plaintiffs Youngs and some Class Members requested DraftKings return these monies.

204.    These requests were rejected and any further request would have been futile.

205.    Plaintiffs and Class Members demand return of these monies and for such further relief as this Court deems just and equitable.

### FOURTH CAUSE OF ACTION
**Violation of New Jersey Consumer Fraud Act—Misleading and Deceptive Advertisements, N.J.S.A. 56:8–1, *et seq.* (Asserted on behalf of New Jersey No-Risk Promotion Class)**

206.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in

the complaint.

207.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

208.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the no-risk promotions.

209.    DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the no-risk promotions.

210.    DraftKings's conduct violated New Jersey law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers could place bets without risking their own money when, in fact, this was not the case.

211.    DraftKings's conduct also violates the New Jersey gambling regulations regarding the advertising of promotions. *See* N.J. Admin. Code § 13:69C-14.2(d).

212.    DraftKings's advertisements for this promotion created a likelihood of confusion and misunderstanding among consumers.

213.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its no-risk offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

214.    DraftKings intended that Plaintiffs and Class Members be misled by the misrepresentations and omissions in its no-risk promotions.

215.    DraftKings induced Plaintiffs and Class Members to rely on its misrepresentations and omissions.

216.    Without these misrepresentations and omissions in DraftKings advertising, Plaintiffs and the No-Risk Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings's platform.

217.    As a direct and proximate result of DraftKings's unfair and deceptive practices, Plaintiffs and the No-Risk Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive cash refunds for bets they placed and lost in reliance on DraftKings "Risk-Free" and "No Sweat" promotions.

218.    These acts caused substantial monetary injury to Plaintiffs and the members of the No-Risk Promotion Class that they could not reasonably avoid.

219.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the No-Risk Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiffs and the No-Risk Promotion Class.

220.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Class and will continue to both damage Plaintiffs and the New Jersey No-Risk Promotion Class and deceive the public unless enjoined by this Court.

221.    Plaintiffs and the No-Risk Promotion Class seek relief under the New Jersey Consumer Fraud Act, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees

and costs.

## FIFTH CAUSE OF ACTION
**Intentional Misrepresentation (Asserted on behalf of No-Risk Promotion Class)**

222.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

223.    Plaintiffs bring this claim against DraftKings individually and on behalf of all Class Members.

224.    As described above, Defendants made material misrepresentations regarding the No-Risk Promotion.

225.    Defendants knew these representations were false and made them intentionally with the intention that users like Plaintiffs and Class Members would rely on them in signing up for the promotion.

226.    These representations were material, in that a reasonable viewer would rely on them when deciding to place a bet in reliance on the promotion.

227.    Plaintiffs and Class Members did rely on these misrepresentations when they deposited money, opted into the promotion and placed a bet, believing they would get their money back if they lost.

228.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via the No-Risk Promotions. Among other things, this reliance was justified because consumers were entitled to understand that a large company in a regulated industry would not make false promises and given the history of gambling companies treating promotions as a loss leader.

229.    Defendants knew or should have known that its representations in marketing materials about the promotion were inaccurate and misleading. Defendants had no reasonable

grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

230.    Neither Plaintiffs nor any reasonable consumer would have used Defendants' service in the same way if they had known of the true operation and risks of Defendants' service—risks the Defendants were aware of and misrepresented.

231.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs and members of the Classes were induced to use the promotion and have been harmed and suffered actual damages in the amount of unrecouped losses from their purportedly no-risk bet.

232.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

<u>**SIXTH CAUSE OF ACTION**</u>
**Violation of New Jersey Consumer Fraud Act—Misleading and Deceptive Advertisements, N.J.S.A. 56:8–1, *et seq.* (Asserted on behalf of New Jersey Sportsbook Deposit Bonus Promotion Class)**

233.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as if fully set forth herein.

234.    Plaintiff Youngs brings this claim against DraftKings under the New Jersey Consumer Fraud Act, individually and on behalf of the New Jersey Sportsbook Deposit Bonus Promotion Class.

235.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the deposit bonus promotions.

236.    DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the

deposit bonus promotions.

237.    DraftKings's sportsbook "$1,000 Bonus" offer is also unfair and deceptive because Plaintiffs and the members of the Class were required to act differently than they could reasonably expect in order to obtain the promised bonus. Plaintiff Youngs and the members of the Class were required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

238.     DraftKings's conduct violated New Jersey law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers would receive a cash-value match of their deposit when, in fact, this was not the case.

239.    DraftKings's conduct also violates the New Jersey gambling regulations regarding the advertising of promotions. See N.J. Admin. Code § 13:69C-14.2(d).

240.    DraftKings's advertisements for this promotion created a likelihood of confusion and misunderstanding among consumers.

241.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling— about the nature of its deposit bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

242.    DraftKings intended that Plaintiff Youngs and Class Members be misled by the misrepresentations and omissions in its deposit bonus promotions.

243.    DraftKings induced Plaintiff Youngs and Class Members to rely on its misrepresentations and omissions.

49

244.    Without the misrepresentations and omissions in DraftKings advertising, Plaintiff Youngs and Sportsbook Deposit Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings's platform.

245.    As a direct and proximate result of DraftKings unfair and deceptive practices, Plaintiff Youngs and Sportsbook Deposit Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive a cash deposit match for the funds they deposited in their DraftKings accounts.

246.    These acts caused substantial injury to Plaintiffs and the members of the Sportsbook Deposit Bonus Promotion Class that they could not reasonably avoid.

247.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the Sportsbook Deposit Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Sportsbook Deposit Bonus Promotion Class.

248.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the New Jersey Sportsbook Deposit Bonus Promotion Class and will continue to both damage Plaintiffs and the Class and deceive the public unless enjoined by this Court.

249.    Plaintiff Youngs and the Class seek relief under the New Jersey Consumer Fraud Act, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and attorney's fees and costs.

## SEVENTH CAUSE OF ACTION
**Intentional Misrepresentation (Asserted on behalf of Sportsbook Deposit Bonus Promotion Class)**

250.    Plaintiff Youngs repeats and realleges the other allegations in this Complaint as

if fully set forth herein.

251.    Plaintiff Youngs brings this claim against DraftKings individually and on behalf of all Class Members.

252.    As described above, Defendants made material misrepresentations regarding the Sportsbook Deposit Bonus Promotion.

253.    Defendants knew these representations were false and made them intentionally with the intention that users like Plaintiffs and Class Members would rely on them in signing up for the promotion.

254.    These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform.

255.    Plaintiff Youngs and Class Members did rely on these misrepresentations when they deposited money, opted into the promotion and made a deposit, believing they would get the promised bonus.

256.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations. Among other things, this reliance was justified because consumers were entitled to understand that a large company in a regulated industry would not make false promises and given the history of gambling companies treating promotions as a loss leader.

257.    Defendants knew that its representations in marketing materials about the promotion were inaccurate and misleading. Defendants had no reasonable grounds for believing its misrepresentations were not false and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

258.    Neither Plaintiffs nor any reasonable consumer would have used Defendants'

service in the same way if they had known of the true operation and risks of Defendants' service—risks the Defendants were aware of and misrepresented.

259.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs and members of the Classes were induced to use the promotion and have been harmed and suffered actual damages in the amount of unrecouped losses from bets and unmatched funds. Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Classes, appointing Plaintiffs Youngs and Thompson as representatives of the Casino Deposit Match Promotion Class and the No Risk Promotion Class, appointing Youngs as representative of the Sportsbook Deposit Bonus Promotion Class and appointing counsel for Plaintiffs as Class Counsel;

B. Declaring that Defendants are financially responsible for notifying the Class Members of the pendency of this suit;

C. Declaring that Defendant's policies and practices as described herein constitute a violation of the state consumer protection statutes;

D. Enjoining Defendant from the wrongful conduct as described herein;

E. Awarding actual and/or compensatory, multiple, punitive (as available according to law), and statutory damages;

F. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

G.  Awarding pre- and post-judgment interest to the extent the law allows; and

H.  Awarding such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues in this Class Action Complaint that

are so triable.

Dated:  August 13, 2025                    Respectfully submitted,

*/s/ Elvin Esteves*

Elvin Esteves
Law Office of Elvin Esteves LLC
460 Bloomfield Avenue, Suite 200
Montclair, NJ 07042
(862) 881-5552
elvin@estevesjuris.com

OF COUNSEL

Michael Kanovitz (admitted *pro hac vice*)
Jon Loevy (admitted *pro hac vice*)
Isaac Green (admitted *pro hac vice*)
Aaron Tucek (admitted *pro hac vice*)
Alexandra Wolfson (application for admission
*pro hoc vice* forthcoming)
Scott Rauscher (application for admission *pro hoc vice* forthcoming)
LOEVY & LOEVY
311 N Aberdeen Street, Suite 3
Chicago, IL 60607
(312) 243-5900
mike@loevy.com

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I, Elvin Esteves, the undersigned attorney of record for Plaintiffs, do hereby certify to my own

knowledge and based upon information available to me, that DraftKings's promotion practices

are the subject of various lawsuits in other jurisdictions, including, but not limited to lawsuits in

federal court in the Northern District of Illinois, the Eastern and Southern Districts of New York,

and the Eastern District of Pennsylvania, but that this is the only currently pending action in any court or administrative proceeding challenging the Defendants' promotional practices alleged in this complaint in New Jersey.

Dated: August 13, 2025

<div align="center" style="margin-left:40%">

*/s/ Elvin Esteves*

Elvin Esteves
Law Office of Elvin Esteves LLC
460 Bloomfield Avenue, Suite 200
Montclair, NJ 07042
(862) 881-5552
elvin@estevesjuris.com

</div>