**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| MATTHEW YOUNGS and CHARLES THOMPSON, individually and on behalf of all others similarly situated, Plaintiff, | : : : | **Civil Action No. 25-00179 (SRC)** |
| v. | : | **OPINION & ORDER** |
| DRAFTKINGS INC. and CROWN NJ GAMING INC. d/b/a DRAFTKINGS, Defendant. | : : | |

---

**CHESLER**, District Judge

This matter comes before the Court on Defendants DraftKings Inc. and Crown NJ Gaming d/b/a DraftKings' ("Defendants" or "DraftKings") motion to dismiss Plaintiffs Matthew Youngs and Charles Thompson's ("Plaintiffs" or "Youngs" and "Thompson") Second Amended Complaint (Dkt. No. 49, "SAC") pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), 12(b)(6), and 12(f). (Dkt. No. 54, "Motion"). Plaintiffs field a brief in opposition to the Motion. (Dkt. No. 60, "Opposition"). Defendants filed a brief in reply. (Dkt. No. 61, "Reply"). The Court heard oral argument on November 5, 2025. (Dkt. No. 63). For the following reasons, Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

The Complaint alleges the following relevant facts. DraftKings is a gambling and entertainment corporation. (SAC at ¶ 24). DraftKings is the most dominant player in New Jersey's

---

[1] Because both parties agree to the dismissal of Counts 6 and 7 of the SAC, which are premised on the "Sportsbook Deposit Bonus Promotion," discussion of that promotion is not necessary in describing the relevant factual background of this case, and is not included here.

gaming industry, and markets itself as "America's #1 casino app." (Id. at ¶ 3). DraftKings maintains various promotions and offers designed to incentivize users to gamble money with DraftKings through its online betting platform. To entice users to participate in these promotions, DraftKings runs advertisements across television, radio, and the internet. Plaintiff Youngs began his use of the DraftKings sportsbook in 2018 and its online casino in 2022. (Id. at ¶ 22). Plaintiff Thompson began his use of DraftKings in 2020, after seeing and hearing numerous ads for various promotions discussed in this case. (Id. at ¶ 23). At issue in this case are advertisements run by DraftKings for two of its promotional programs. (See Id. at ¶ 6).

First, the "Risk-Free" Promotion. As alleged, this promotion is generally advertised as providing users a "Risk-Free" bet up to a specified amount of money. (Id. at ¶ 30). The rules of the promotion operate roughly as follows. A user deposits $X into his account. If he wagers that money and loses, he receives a "Bonus Bet" for the amount of $X. (Id. at ¶ 45). But, Bonus Bets are not the equivalent of cash, because they have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn. (Id. at ¶ 46). If the user wagers the Bonus Bet and wins, he gets less than he would have if he had won that bet with actual cash. For example, if the user uses a $100 Bonus Bet on a winning wager with 50/50 odds, he will get $91 ($100 winnings, minus 9% vig) without a return of his original $100 stake. (Id. at ¶ 49).

Plaintiffs allege that they both saw many ads for this promotion in 2020 which promised they could place bets "Risk-Free." (Id. at ¶¶ 34, 36, 38). Neither Youngs nor Thompson recall ever having seen the full terms of the promotion either during the ads or in the process of opting into the promotion. (Id. at ¶¶ 35, 37, 39). After seeing and hearing advertisements, Youngs placed a bet through this promotion and, to his "surprise[]," ended up losing his entire stake, recouping nothing from the bet. (Id. at ¶ 36). Also in 2020, Thompson similarly placed a bet through this

promotion, lost, and received a Bonus Bet. (<u>Id.</u> at ¶ 8). Both Plaintiffs believe they entered this promotion by clicking a green "Place Bet" button in the DraftKings app on a page where the only way to see terms and conditions would have been to click a small "i" button next to the promotion. (<u>See</u> <u>Id.</u> at ¶ 60, Fig. 5). In 2022, DraftKings began using the language "No Sweat" in its advertisements to describe the promotion in place of the "Risk-Free" promise. (<u>Id.</u> at ¶ 68).

Second, and somewhat more complicated, the "Casino Deposit" promotion. As alleged, this promotion is generally advertised as providing users a "100% Deposit Bonus" or "100% Deposit Match" up to a specified amount of money, typically $2,000. (<u>Id.</u> at ¶ 76). The rules of the promotion operate roughly as follows. The user deposits $X into his account. To get the matching amount of $X from DraftKings, the user must satisfy the playthrough requirement. The playthrough requirement can vary slightly but generally requires a user to gamble between ten to fifteen times the sum of the amount the user deposited plus the amount of a hypothetical match. (<u>Id.</u> at ¶ 92). For example, if a user deposits $2,000, and therefore expects to receive a $2,000 match, he would need to gamble at least $40,000 to qualify for the match, assuming a ten times playthrough requirement ($2,000 plus $2,000 times ten). (<u>See</u> <u>Id.</u>). This playthrough requirement is subject to two additional constraints. First, money wagered on certain games, where the odds are somewhat more favorable to the player, count only fractionally toward the playthrough amount. (<u>Id.</u> at ¶ 95). Money spent on Blackjack, for example, counts only at a 20% rate towards the playthrough requirement. (<u>Id.</u>). Second, the user must complete this playthrough requirement within a defined timeframe, in this case as short as seven days. (<u>Id.</u> at ¶ 100). Once the user has wagered the full amount of his initial deposit, all money in his account is subject to forfeiture if he fails to meet the playthrough requirement, including the amount of his initial deposit. (<u>Id.</u> at ¶ 104).

In late 2022 or early 2023, Youngs saw and heard advertisements for this program on various platforms. (Id. at ¶ 81). These advertisements were not all identical, but all promised, in large print, that the player would receive a "100% Deposit Bonus" or "100% Deposit Match" up to a specified amount of money, generally, $2,000. (Id. at ¶ 76). According to the SAC, none of the advertisements that Youngs saw "conspicuously" disclosed the entirety of the complex terms of the promotion, which made it more difficult than Youngs anticipated to actually receive a 100% deposit match. (Id. at ¶ 81). However, Youngs does recall seeing a television advertisement for the promotion in early 2023, which, in its final five seconds, included some of the more complicated terms of the promotion, like that some games only count fractionally toward the playthrough, in small print. (Id. at 82, n. 5). Based on his belief that the promotion ensured that he would receive a 100% match of his deposit up to $2,000, Youngs deposited $500 into his DraftKings account in early 2022 or late 2023. (Id. at ¶ 78). He did so by clicking a green "PLAY NOW" button on an advertising banner which promised users a "100% match up to $2,000 on your first deposit.*" There was an asterisk next to this language but no apparent full disclosure of the promotion's terms. (Id. at ¶ 83, Fig. 3). Youngs does not recall seeing any description of the various requirements of the promotion on the page where he made his deposit. (Id. at ¶ 20). Upon depositing the $500, Youngs learned of and then attempted to satisfy the playthrough requirement. (Id. at 79). In that process, he lost all his money. (Id.).

Thompson saw and heard various advertisements for this promotion around the same time he entered the promotion in 2020. (Id. at ¶ 85). He recalls the ads promising a "100% deposit match," and made his $750 deposit for the promotion by way of an advertisement on the DraftKings mobile app's home page. (Id. at ¶ 86). Unlike Youngs, Thompson seems to have won money in the process of trying to satisfy the playthrough requirement. But, because he did not

successfully meet the playthrough requirement in the designated timeframe, all the money in his account was forfeited to DraftKings.  (See Id. at ¶ 87).

On April 17, 2025, Plaintiff Youngs filed the First Amended Class Action Complaint ("FAC"), along with his co-plaintiff at the time, Jason Lombardozzi. (Dkt. No. 34).  A month later, DraftKings moved to dismiss the FAC.  (Dkt. No. 39).  On July 23, 2025, the Court heard oral argument on that motion, and shortly thereafter, this Court dismissed all the counts in the FAC, all but one without prejudice.  (Dkt. No. 47).  At oral argument, the Court instructed the Plaintiffs on the deficiencies of their pleading, and what it expected in any future re-pleading.  (Dkt. No. 48). On August 13, 2025, Plaintiffs filed the SAC, adding a new plaintiff, two new claims, and two new classes.  (Dkt. No 49).  Defendants have once again moved to dismiss the complaint.  (Dkt. No. 54).

## II.    DISCUSSION

DraftKings asks this Court to dismiss the SAC under Federal Rules of Civil Procedure 12(f), 9(b), 12(b)(1), and 12(b)(6).   The Court will consider the various arguments in DraftKings' application as follows.

### A.  *The Court will Not Strike Newly Added Claims, Classes, or Plaintiff Under Rule 12(f)*

DraftKings first seeks to dismiss Count 5, Plaintiff Thompson, and the new nationwide classes included in the SAC under Federal Rule of Civil Procedure 12(f).  DraftKings argues these amendments are improperly beyond the scope of what this Court intended to permit in granting dismissal of the FAC without prejudice.[2]   (Mot. at 5).  DraftKings misconstrues this Court's statements from the July 23, 2025 hearing as placing strict limitations on Plaintiffs' ability to

---

[2] DraftKings also asserts that Count 7 is improper for the same reason. But, as both parties have agreed to the dismissal of Counts 6 and 7, and the Court will dismiss these counts for lack of standing, the Court does not address Count 7 here.

amend their complaint.  The Court intended to do no such thing.  Rather, the Court merely gave Plaintiffs permission to replead and provided directions on the deficiencies in their complaint. Further, even if the Court had intended to limit the re-pleading as DraftKings proposes, it is within the Court's discretion to entertain the new additions to the SAC.  See, e.g., In re Synchronoss Techs., Inc. Sec. Litig., No. 17-71732021, WL 1712394, at *10 n.4 (D.N.J. Apr. 30, 2021) (stating that leave to "re-allege . . . was not intended to be carte blanche for Plaintiff to incorporate new claims" but "[n]onetheless, the Court will consider Plaintiff's [new] claim.").  Accordingly, the Court will not dismiss any new count, plaintiff, or class on this basis.

B.  *Plaintiffs Lack Standing for Certain Claims*

First, DraftKings argues and Plaintiffs concede that Counts 6 and 7 should be dismissed for lack of standing and that Plaintiffs are not entitled to injunctive relief on their claims.  (See Opp. at 10).  The Court agrees and will dismiss Counts 6 and 7 because, as DraftKings correctly points out, Plaintiffs did not even allege to have entered the "New Customer" promotion they sought to challenge.  (Mot. at 8-9).  The Court also agrees that Plaintiffs are not entitled to injunctive relief.  This was Plaintiffs' third opportunity to plead their case. As evidenced by the fact that Plaintiffs did not so much as raise a single counterargument to Defendants' arguments here, they could not have believed at the time of filing that they had anything more than a trivial chance of success on these claims.  If they did, it suggests they had not seriously considered the facts of their own case.

Second, Defendants argue that Plaintiffs do not have standing to assert claims related to the "No Sweat" promotion and that Plaintiffs' SAC improperly conflates two distinct promotions: the "No Sweat" promotion and the "Risk-Free" promotion.  (Mot. at 7-8).  This Court agrees. Plaintiffs treat the two promotions as one and argue that their allegations should apply with equal

force to each.  (See SAC at ¶ 68).  But, the language of each set of advertisements is meaningfully different. "No Sweat" and "Risk-Free" have markedly different connotations, with the latter much more obviously assuring users that any potential bet would be without risk.  Crucially, both Plaintiffs allege that they entered the "Risk-Free" promotion at least two years before DraftKings even began to use the "No Sweat" language.  (See SAC at ¶¶ 36, 38, 68).  In fact, Plaintiffs never allege they were induced to enter a DraftKings promotion by the temptation of an advertisement promoting a "No Sweat" bet.  Accordingly, Plaintiffs have not suffered an injury-in-fact with respect to the "No Sweat" promotion and all claims based on this language will be dismissed for lack of standing, but all claims based on "No-Risk" or "Risk-Free" language are permitted.[3]

C. *Plaintiffs Plead with Adequate Specificity to Satisfy Rule 9(b)*

DraftKings asserts that all of Plaintiffs' fraud-related claims (Counts 1, 2, 4, and 5) must be dismissed because Plaintiffs do not meet the heightened pleading standard set out by Federal Rule of Civil Procedure 9(b).  (Mot. at 11-14).  Rule 9(b) requires that, when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  A plaintiff may satisfy 9(b) by pleading the "date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud."  Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004) (internal citations omitted), abrogated in part on other grounds by Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007).

---

[3] The Court also notes that even if Plaintiffs had alleged that they were drawn into a promotion based on the "No Sweat" advertisements, that phrasing is likely mere puffery as it is not an "'assurance of fact.'" EP Henry Corp. v. Cambridge Pavers, Inc., 383 F. Supp. 3d 343, 349 (D.N.J. 2019) (citation omitted).  In contrast, the language of "risk-free" or "no risk" is not mere puffery because it conveys a matter of fact to the reader.  Namely, that the user is at no risk of losing the money they deposit for the promotion.

In this case, the Court clearly articulated, on the record, what it expected from Plaintiffs to satisfy 9(b):

> I want to know what the plaintiffs saw, what they didn't see. And if they didn't see it, why. I want to know if they contend that there was a advertisement [sic] which required a click–through to see what the terms and conditions were. To the extent that they recall it, I want to know that. To the extent that the terms and conditions were in fact part of the actual promotion that they received, which appears to be the case, for example, with Exhibit 15, I want to know it. And if plaintiff did not read it, I want to know why.

(Dkt. No. 48 at 61:9-19).

Upon re-pleading, the SAC has given adequate information to meet these requirements. Plaintiffs have provided information as to the general substance of the advertisements at issue and have sufficiently alleged that they were never directed to nor recall ever having seen any of the disclosures which DraftKings contend revealed the full terms and details of the promotions in question. (See SAC at 7, Fig 4; 16, Fig. 7).[4] Plaintiffs have alleged that they both saw and heard advertisements for the "Risk-Free" promotion, which promised users a "Risk-Free Bet," across multiple media platforms in 2020, before each opted into the promotion. (Id. at ¶¶ 34, 36, 38). The SAC also states that Plaintiffs do not recall seeing the terms and conditions of the promotion in any of the advertising, nor did they see the promotion's full terms before actually entering the "Risk-Free" promotion. (Id. at ¶¶ 35, 37, 39). For example, Plaintiffs allege that they both entered the "Risk-Free" promotion by clicking a green "Place Bet" button, without ever clicking into the optional and small "i" button behind which they would have found the terms and conditions of the promotion. (Id. at ¶ 60, Fig. 5).

---

[4] While these ads included in the SAC are not alleged to be the precise ads that induced Plaintiffs into participating in the promotions, nor could they possibly be given their timing, they provide a representation of the kinds of ads at issue.

The SAC also satisfies 9(b) as to the "Casino Deposit" promotion. Plaintiffs allege that they encountered ads for this promotion on various platforms which promised a "100% Deposit Match" and that they do not recall seeing the terms for this promotion before they deposited their money with DraftKings. (See Id. ¶¶ 75-76, 81, 88). More specifically, for example, Youngs alleges that he entered the promotion through an ad substantially like the one reproduced as Figure 2 in the SAC (Id. at 19), which contains an asterisk next to the language advertising the promotion but apparently does not specify terms and conditions. Youngs also alleges that he saw a television ad around the time he entered into the "Casino Deposit" promotion, which flashed, in small font, certain terms of the promotion for the final five seconds of the ad. (Id. at ¶ 82). Similarly, Thompson alleges that he entered this promotion through an advertisement on the home page of the DraftKings mobile app. (Id. at ¶ 86).

DraftKings seems to demand that Plaintiffs plead the exact advertisements Plaintiffs saw which induced them to enter the promotions. (See Mot. at 12-14). But, given that much as five years have passed since Plaintiffs saw and heard some of the ads and played the promotions about which they complain, it is perfectly understandable why Plaintiffs would not recall the precise details of the specific advertisements to which they responded. Accordingly, Rule 9(b) does not require that level of specificity and neither does this Court. See Diebler v. SanMedica International, LLC, 448 F. Supp. 3d 169 (D.N.J. 2020) (finding plaintiff satisfied Rule 9(b) without requiring plaintiff to produce the exact advertisement she saw, but rather by pleading "who (San Medica International), what (SeroVital and its packaging), when (January 2016 after viewing television advertisements in 2015 and 2016); where (Plaintiff purchased SeroVital while in New Jersey); and how (SeroVital is advertised as increasing HGH levels and markets the benefits of HGH, but seems to yield neither higher HGH levels nor any associated health benefits).").

Given that DraftKings is undoubtedly in possession of information revealing the circumstances and time when each named Plaintiff entered each relevant promotion, it follows that it is in possession of the advertisements and related disclosures concerning those promotions, during the relevant timeframe. Under these circumstances, it is not unfair to require DraftKings to respond to Plaintiffs' SAC. In other words, DraftKings is in full control of information regarding what advertisements were released at what time, and what information was included in those advertisements. Similarly, DraftKings has exclusive information regarding what disclosures must have been made to Plaintiffs' before they deposited their money with DraftKings. See Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 158 (3d Cir. 2014) (determining the requirements of 9(b) were met where only Defendant had access to material that could have "easily prove[n] the claim one way or another."). Presumably, Plaintiffs will make a discovery demand for all materials DraftKings has on the promotions and their related advertising. At that point, DraftKings may move for summary judgment and submit exactly which ads were run and what disclosures were made at the time of the allegedly problematic conduct.

### D. *Plaintiffs' CFA Claims are not Preempted by the CCA*

DraftKings argues that Plaintiffs' Consumer Fraud Act ("CFA") claims (Counts 1 and 4) are preempted by the Casino Control Act ("CCA"). (Mot. at 15). The Supreme Court of New Jersey has stated that in certain circumstances it is appropriate, and required, for courts to defer to the judgment of the Casino Control Commission ("CCC"). As the Campione Court stated:

> The pervasiveness of the regulatory scheme controlling the casino industry indicates that the Legislature intended to invest the CCC with primary jurisdiction to regulate the casino industry. To the extent that the resolution of a plaintiff's claim depends on an interpretation of the Act or administrative regulations, the CCC should have the first opportunity to provide that interpretation.

<u>Campione v. Adamar of New Jersey, Inc.</u>, 155 N.J. 245, 264 (1998). But importantly, the Court has taken a narrow view regarding when a court should find that a CFA claim is preempted by the CCA and, inversely, a broad view of the reach of the CFA.  As the <u>Lemelledo</u> Court noted:

> We are loathe to undermine the CFA's enforcement structure, which specifically contemplates cumulative remedies and private attorneys general, by carving out exemptions for each allegedly fraudulent practice that may concomitantly be regulated by another source of law. *The presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation, preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud* . . . [t]he language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud.

<u>Lemelledo v. Beneficial Mgmt. Corp. of Am.</u>, 150 N.J. 255, 264, 270 (1997) (emphasis added) Here, nothing in Plaintiffs' SAC suggests that the resolution of their claims depends on interpretation of the CCA or related regulations as articulated in <u>Campione,</u> and the <u>Lemelledo</u> presumption of non-preemption appears strong.  New Jersey's Appellate Division has further emphasized the position of the Supreme Court. As the <u>Bandler</u> court wrote:

>  "'[R]egulation is frequently complementary, overlapping, and comprehensive.' To preserve the goals of overlapping statutes, the Court set a high bar for preemption. 'Absent a nearly irreconcilable conflict, to allow one remedial statute to preempt another or to co-opt a broad field of regulatory concern, simply because the two statutes regulate the same activity, would defeat the purposes giving rise to the need for regulation.'"

<u>Bandler v. Landry's Inc.</u>, 464 N.J. Super. 311, 319, 235 A.3d 256, 261 (App. Div. 2020) (quoting <u>Lemelledo</u>, 150 N.J. at 271).

Concretely, this all means that claims brought under the CFA may be preempted where there exists a "direct and unavoidable conflict . . . between application of the CFA and application of the other regulatory scheme or schemes."  <u>Lemelledo,</u> 150 N.J. at 270 (1997).  That conflict must be "patent and sharp and must not simply constitute a mere possibility of incompatibility." <u>Id.</u>  Courts should be especially wary of allowing CFA claims to proceed if the regulations at issue

-11-

and the CFA will "work at cross-purposes." Id.  In the instant case, DraftKings maintains that the CCA poses the very kind of "patent and sharp" conflict to the CFA envisioned by the Lemelledo court.  Further, Defendants argue that because the CCA vests the CCC with "'exclusive jurisdiction' over the regulation of gaming," and specifically over "gaming-related advertising and promotions," the CFA claims are preempted and therefore must be dismissed. This Court disagrees.  (Mot. at 16).

In reviewing the caselaw on CCA preemption of the CFA in cases like the one at bar, there emerges a clear distinction between "gaming-related advertising" (see N.J.S.A. 5:12-70(a)(16)) and general advertising designed to lure individuals into casinos.  Federal and state courts across New Jersey have concluded that the former is exclusively regulated by the CCA, but the latter is not.  Accordingly, challenges to gaming-related advertising, which deal with highly technical aspects of gambling, and which require agency expertise, are preempted by the CCA.  See, e.g., Doug Grant v. Greate Bay Casino Corp., 232 F.3d 173, 188–89 (3d Cir. 2000) (dismissing CFA claims as preempted because the CCA exclusively governed advertising that referred to specific aspects and rules of Blackjack); Antar v. Borgata Hotel Casino & Spa, LLC, No. CV 22-05785, 2024 WL 1672280, at *3 (D.N.J. Jan. 31, 2024) (dismissing CFA claims as preempted by the CCA where the core issue hinged on a "highly technical" aspect of gambling, and distinguishing the case from others that consider "generally applicable advertising deception."); Marcangelo v. Boardwalk Regency Corp., 847 F. Supp. 1222, 1226 (D.N.J. 1994) (dismissing CFA claims as preempted by the CCA where plaintiff brought CFA challenges to the signage on the face of a "Pokermania" slot machine which he alleged failed to give fair notice of the rules of the game). On the other hand, challenges to more general kinds of casino advertisements may proceed under the CFA.  See, e.g., Bandler, 464 N.J. Super. at  324  (finding no preemption where plaintiff

brought a challenge to an allegedly deceptive advertisement that promised "$150,000 in prize money" in relation to a specific poker tournament, where the core issue was "whether the statement . . . was deceptive" and "the advertisement itself [did] not pertain to arcane or technical rules of the game."); Smerling v. Harrah's Ent., Inc., 389 N.J. Super. 181, 184, 912 A.2d 168, 170 (App. Div. 2006) (finding no preemption where plaintiff brought challenges to allegedly deceptive advertisements, one entitled "$15 birthday cash" that plaintiff could not in fact redeem, and a second entitled "Money Train" which the plaintiff alleged contained material terms that were obscured). This distinction exists because in the latter set of cases, "the consumer fraud and casino control schemes regulate with a mutual view toward assuring that such advertisements are in no way deceptive," Smerling, 389 N.J. Super. at 193 (citation omitted), and "no special expertise vested in the [regulatory agency] is required to resolve the question." Bandler, 464 N.J. Super. at 324.

So, the question becomes, on which side of the line does this case fall? Here, Plaintiffs have alleged they were deceived by a series of advertisements into depositing money with DraftKings. They allege similarly that the terms and conditions of the promotions were in one way or another, obscured, such that they did not read or understand the terms to which they were agreeing. The primary set of issues in this case surround the simple question of whether the advertisements were themselves deceptive. In this respect, this case is on all fours with Bandler and Smerling and is unlike Doug Grant, Antar, and Marcangelo. Like the Bandler court, this Court finds no "direct and unavoidable conflict" between the CFA and CCA because the challenged conduct at issue does not concern "gaming-related advertising" within the meaning of the CCA, Bandler, 464 N.J. Super. at 323-324.

None of the other provisions cited by Defendant (those not mentioning gaming-related advertising) convince this Court that the CCA and CFA come into "patent and sharp" conflict here, nor that the CCA deals "specifically, concretely, and pervasively" with the conduct at issue in this case. Lemelledo, 150 N.J. at 270. DraftKings has pointed to no "irreconcilable conflict" in its moving papers, and none is apparent to the Court. Id. at 271.

E. *Plaintiffs' "Casino Deposit" CFA Claim is Dismissed (Count 1), but Plaintiffs' "Risk-Free" CFA Claim Survives (Count 4)*

To state a claim under the CFA, a Plaintiff must plead: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557, 964 A.2d 741, 749 (2009) (citation omitted). Plaintiffs successfully plead all three with respect to the "Risk-Free" promotion but fail to plead ascertainable loss with respect to the "Casino Deposit" promotion.

First, unlawful conduct. DraftKings essentially argues that because the full terms and conditions were available *somewhere*, Plaintiffs cannot plausibly show the ads were deceptive and therefore unlawful. (See Mot. at 20-23). This Court disagrees and finds that for both promotions, Plaintiffs at least plausibly plead deception on the part of DraftKings, and therefore, plausibly plead unlawful conduct.

Concealing the terms of a promotion under a bold heading and having fine print terms which are unascertainable or too small to realistically read may constitute illegal and deceptive conduct, even if the terms were at some point fully provided and clearly spelled out. (See SAC at 7, Fig. 4; 24, Fig. 3; ¶ 82, n. 5). See , e.g., Miller v. Am. Fam. Publishers, 663 A.2d 643, 652 (N.J. Ch. Div. 1995) ("It is true that in each of defendant's mailings there is at least one piece of literature containing the quoted disclaimer or a similar statement. But it is also true that such language is

overwhelmed, and virtually lost, amid the other statements—larger, more colorful, and more dramatic—than the formal disclaimer."); <u>Scanlon v. DraftKings</u>, No. 2484CV01099 (Mass. Super. Ct. 2023) (refusing to dismiss a similar claim at the motion to dismiss phase because, "[w]hile, based on my review of the small print provided with the Complaint, the terms and conditions disclosed to Plaintiffs accurately describe the very conditions about which Plaintiffs now complain, the overall deceptiveness of the mobile app and website, sign up process, and terms and conditions cannot be resolved without additional information."). All the more so, including only a small asterisk in certain ads, which apparently had no terms in the advertisements themselves, may constitute illegal and deceptive conduct. (<u>See</u> SAC p. 19, Fig. 2; SAC p. 18, Fig. 1). Further, DraftKings had every right to show in its reply papers what exactly Plaintiffs must have seen in terms of disclosures before they entered the promotions at issue. The fact that it chose not to do so speaks volumes.

On a motion to dismiss under Rule 12(b)(6), "the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." <u>Motino v. Toys "R" Us, Inc.</u>, No. 06-370, 2007 WL 2123698, at *1 (D.N.J. July 19, 2007). Here, Plaintiffs, through the SAC, have alleged, among other things, that they did not see the full terms in any of the promotions because the terms were intentionally obscured or non-existent, (<u>see</u> SAC ¶¶ 35, 37, 39, 51, 55, 56–61, 79, 82–84, 88, 108, 114) and when the advertisements did disclose additional terms and conditions, the language was intentionally confusing and written in unreadably small font. (<u>See id.</u> at ¶¶ 99, 106–07).

Moving to ascertainable loss, Plaintiffs properly plead such loss for the "Risk-Free" promotion, but do not do so for the "Casino Deposit" promotion. A plaintiff suffers ascertainable loss when he receives "less than what was promised." <u>Solo v. Bed Bath & Beyond, Inc.</u>, No. 06-

cv-1908, 2007 WL 1237825, at *3 (D.N.J. Apr. 25, 2007). "In cases involving alleged misrepresentations, as here, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle." Id. (citation omitted).

With respect to the "Risk-Free" promotion, users such as Plaintiffs here, are promised a bet that is, as the advertisements suggest, without risk. This means that if a user deposits and wagers $5 and loses that bet, he will reasonably expect to receive a refund of $5 back, thus making his bet entirely without risk. Simply put, that is not how the promotion actually works. Instead, when a player of this promotion wagers $5 and loses, he receives a $5 Bonus Bet, which is essentially a coupon to place another $5 wager on the DraftKings app. (SAC at ¶ 45). This Bonus Bet is not the same as getting $5 in cash back because it has no cash value, is non-transferrable, non-withdrawable, and has an expiration date. (Id. at ¶ 46). Further, if the player then wagers that $5 and wins, he gets less money than he would if he had bet with actual cash. (See id. at ¶ 49). And, if the player loses the wager of that Bonus Bet, he is left with nothing at all. Plaintiffs both played this promotion and lost their initial bets (Id. at ¶¶ 8, 36, 38, 40) thus sufficiently pleading ascertainable loss because they received "less than what [they were] promised" by not getting the refund to which they reasonably believed they were entitled. Solo, 2007 WL 1237825, at *3. Though Plaintiffs do not plead the precise amount of their loss, that is not fatal at this stage as they need not "plead the exact dollar amount of their loss." Block v Seneca Mortgage Servicing, 221 F. Supp. 3d 559, 594 (D.N.J. 2016) (citation omitted). Rather, they need only plead so as to "provide enough specificity to give defendants notice of their possible damages." Id.

Plaintiffs do not properly plead ascertainable loss as it relates to the "Casino Deposit" promotion. Instead, as DraftKings argues, (Mot. at 19), Thompson and Youngs' losses from this promotion appear to be much closer to mere gambling losses, which do not suffice for a showing

of ascertainable loss under the CFA.  See Antar v. BetMGM, LLC, 2025 WL 1219316, at *3 (3d Cir. Apr. 28, 2025) ("Antar II") (the court could not "differentiate the losses [the plaintiff] suffered as a result of the defendants' alleged conduct versus those losses he suffered as a natural result of playing a game where the odds are stacked against the player.").

It bears repeating how each Plaintiff lost money from playing this promotion.  Youngs deposited $500 into his DraftKings account with the hope of receiving the "100%" match that he had seen in the relevant advertising.  Upon doing so, he learned about and attempted to satisfy the promotion's arduous playthrough requirements.  In doing so, he gambled and lost all of his money. Accordingly, Youngs' loss was a mere function of his failure to gamble successfully, which is not sufficient for a showing of ascertainable loss.

Thompson's case is a bit more complex, but the Court's conclusion is the same.  Thompson deposited $750 to play this promotion.  He too attempted to satisfy the playthrough requirements, but unlike Youngs, he did not lose his money in the process of attempting to meet the playthrough requirements.  (Opp. at 24).  Rather, he simply failed to meet the playthrough requirements within the mandated seven-day period and, as a result, and in accordance with the rules of the promotion, all of the money in Thompson's account was forfeited to DraftKings.  (Id.).  Thompson argues that because DraftKings took all the money left in his account at the end of seven days he has shown ascertainable loss.  (Id.).  But this misunderstands the promotion.  As the SAC notes, the promotion rules dictate that all money a player seeks to wager is taken out of his account and wagered in a specific order, with money first taken from his initial deposit, until that is exhausted.  (SAC at ¶¶ 99-101).  Until a player has wagered the full amount of his initial deposit (here $750), he may withdraw any amount left of his initial deposit for himself.  (See Mot. at 19, n. 15).  But, once he wagers that amount, any money still in his account is considered "winnings," which do not actually

-17-

belong to him until he has satisfied the requirements of the promotion.  There is no allegation in the SAC that Thompson retained any money from his initial deposit of $750 in his account that had not yet been wagered.  This means that ultimately, Thompson argues that he lost "winnings" and a "bonus," which were never really his in the first place.  If Thompson had alleged that he did not wager the full amount of his initial deposit and that DraftKings had taken that money, that might make for ascertainable loss.  But those are not the facts of this case.  Because Plaintiffs do not plead ascertainable loss with respect to the "Casino Deposit" promotion, Count 1 will be dismissed.

The losses from this promotion are distinct from the losses in the context of the "Risk-Free" promotion because here Plaintiffs did not lose their initial deposits for which they were promised a refund.  Under the "Risk-Free" promotion, Plaintiffs lost what is essentially a refund of the amount of their initial bet which they were promised would be without risk.  Here, Plaintiffs both wagered the entire amounts of their initial deposit, to which they were not entitled a refund.  Instead, they lost what they expected to be a "deposit bonus" or "deposit match," which is a reward for successfully completing the promotion's playthrough requirement, the winning of which was "not guaranteed."  Antar II, 2025 WL 1219316, at *2–3.

DraftKings also argues that Plaintiffs do not plead causation as required by the CFA.  (Mot. at 23).  The Court disagrees and finds that to the extent there is ascertainable loss here, that loss was caused, at least in part, by DraftKings' conduct in producing allegedly deceptive advertising which induced Plaintiffs into joining the "Risk-Free" promotion under the impression they would be guaranteed a refund should they lose their initial deposit.  See Varacallo v. Massachusetts Mut. Life Ins. Co., 752 A.2d 807, 816 (N.J. App. Div. 2000) ("Plaintiffs are required to prove only that defendant's conduct was a cause of damages. They need not prove that [the defendant's] conduct

was the sole cause of loss."). However, where there is no ascertainable loss here, there is, likewise, no causation.

Finally, the Court disagrees with DraftKings' contention that the CFA claim based on the "Casino Match"[5] promotion does not involve the sale or advertisement of "Merchandise" as is required by the CFA (Count 1). This argument is unavailing because "Merchandise" is broadly defined to include "services." N.J.S.A. 56:8-1(c). Here, DraftKings offers services in the form of gaming entertainment. See Bandler, 235 A.3d at 261 n.3 ("'Merchandise' . . . no doubt covers gaming entertainment.").

F. *Plaintiffs Fraud Claims (Counts 2 and 5) Survive*

Plaintiffs bring two common law fraud claims alleging that DraftKings fraudulently and intentionally induced them into entering the promotions at issue (Counts 2 and 5). Generally, to plead common law fraud, a plaintiff must allege: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Kaufman v. i-Stat Corp., 165 N.J. 94, 109, 754 A.2d 1188, 1195 (2000). Both parties essentially agree that the common law fraud claims rise and fall with the CFA claims, and only significantly disagree over whether DraftKings had "intent and that DraftKings knew its representations were allegedly false when they were made." (Mot. at 27-28). Largely for the reasons already discussed in explaining the viability of the CFA claim based on the "Risk-Free" promotion, the corresponding common law claim (Count 5) also survives. (See supra section II.E). As for the scienter requirement of this common law claim, the Court has no trouble concluding

_____

[5] DraftKings apparently does not challenge the application of the CFA to the "Risk-Free" promotion on these grounds, but even if it did, this Court would reject such a challenge for the same reasons described here.

that the way Plaintiffs allegedly describe this promotion and the disclosure (or lack thereof) of its terms and conditions are at least arguably demonstrations of intentional conduct designed to conceal the actual risks and limitations of the promotion and therefore constitute circumstantial demonstration of intent.  This includes the disclosure of terms in small font, the lack of terms in advertisements, and failure to require bettors to read terms before depositing money.  These allegations are sufficient for surviving a motion to dismiss. See Fed. R. Civ. P. 9(b) (Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Count 2, based on the "Casino Deposit" promotion is somewhat more precarious, but survives as a claim for equitable, rather than common law, fraud.  First, because the Court found no ascertainable loss in its CFA analysis, it also finds Plaintiffs do not adequately plead damages as required under the common law of fraud.  Instead, Plaintiffs adequately plead equitable fraud.  Though Count 2 is not stylized as a claim for equitable fraud seeking equitable relief, Plaintiffs "seek all available remedies." (SAC at ¶ 232).  Further, a "complaint is sufficient against a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), if it appears from the complaint that the plaintiff may be entitled to any form of relief, even though the particular relief he has demanded and the theory on which he seems to rely are not appropriate."  5 C. Wright & A. Miller, Federal Practice & Procedure § 1219 (4th ed. 2022); See also Harrison v. Springdale Water and Sewer Co., 780 F.2d 1422, 1426 (8th Cir.1986) (citations omitted) ("a complaint should not be dismissed merely because plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory"); R.J. Potvin, III Investment Trust v. Auburn Water District, 2018 WL 2425926 (D. Me. 2018) ("Although Count II is not styled as a claim for inverse condemnation, that claim appears to be factually supported by the allegations.").

-20-

To state a claim for equitable fraud, and to therefore be entitled to an equitable remedy such as rescission, a plaintiff must show "(1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental and reasonable reliance by the other party." Tonglu Rising Sun Shoes Co. v. Nat. Nine (USA) Co., No. CV141634, 2016 WL 7374543, at *3 (D.N.J. Dec. 20, 2016); Liebling v. Garden State Indem., 337 N.J. Super. 447, 453, 767 A.2d 515, 518 (App. Div. 2001). Notably a plaintiff is not required to show actual pecuniary loss to receive an equitable remedy. See Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 626, 432 A.2d 521, 525 (1981) ("Actual loss in the financial sense is not required before equity may act; equity looks not to the loss suffered by the victim but rather to the unfairness of allowing the perpetrator to retain a benefit unjustly conferred."). For reasons already discussed in considering unlawful conduct under the CFA, requirement (1) is satisfied. (See supra section II.E). As to DraftKings' intent, the Court views the allegations relating to the "Casino Deposit" promotion advertising much like those for advertising of the the "Risk-Free" promotion: as circumstantial evidence of intent by DraftKings. Finally, Plaintiffs detrimentally and reasonably relied on DraftKings misrepresentations in deciding to deposit their money and play the "Casino Deposit" promotion. Accordingly, Plaintiffs plausibly state a claim for equitable fraud and may be entitled to equitable relief such as rescission. See First Am. Title Ins. Co. v. Lawson, 177 N.J. 125, 136, 827 A.2d 230, 237 (2003) ("The law is well settled that equitable fraud provides a basis for a party to rescind a contract."). This claim may be subject to a number of affirmative defenses by DraftKings but any such defense would need to be developed through the discovery process and would therefore need to be raised at a later stage of this litigation.

G. *Plaintiffs do not State a Claim for Conversion*

Plaintiffs' Third Cause of Action purports to state a claim for common law conversion against DraftKings with respect to the "Casino Deposit" promotion. (SAC at ¶¶ 198-205). This claim will be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted because, simply put, no conversion has occurred.

Plaintiffs argue that they were entitled to the amount of their initial deposit and any winnings that they accumulated in playing through the "Casino Deposit" promotion, and therefore, DraftKings converted that money by (a) not returning the full amount of the deposit and (b) taking any winnings when the playthrough requirement was not satisfied. (See Opp. at 28).

Conversion claims require an "*unauthorized* assumption and exercise of the right of ownership over goods . . . belonging to another . . . ." Vita v. Vita, 2022 WL 376764, at *3 (D.N.J. Feb. 8, 2022) (citation omitted) (emphasis added). Here, taking all of Plaintiffs' claims at face value, they do not contend that DraftKings took any money from Plaintiffs which was not pursuant to the terms of an agreement into which Plaintiffs at least arguably entered. Under the very terms of that agreement, DraftKings was, in fact, entitled to take the money at issue. (See SAC at ¶¶ 99-105). In other words, even if Plaintiffs are successful in showing the contract or contracts to which they agreed under the terms of the promotion were fraudulently induced, the money was taken out of Plaintiffs' accounts pursuant to an agreement that existed at the time. That is not conversion.

H. *It Would be Premature to Dismiss the Nationwide Class Allegations at this Stage*

Plaintiffs bring three claims on behalf of nationwide classes. DraftKings argues that Plaintiffs should not be permitted to proceed with any cause of action on behalf of a nationwide class because the named Plaintiffs are residents of and have only been harmed in New Jersey. (See Mot. at 30). Of note, Plaintiffs only purport to represent a nationwide class on their common law claims, not their CFA claims. While it would likely be impossible to maintain CFA claims for a

nationwide class given the statutory differences across various states, the standard for common law fraud is essentially consistent throughout the country and maintaining a nationwide class with respect to such claims may be more reasonable.  It is certainly possible that the class will need to be narrowed to consist only of those individuals who placed bets in or were residents of New Jersey, but this is a matter better addressed at the class certification stage than at the motion to dismiss stage.  Accordingly, at this stage, the nationwide class allegations will not be dismissed.

## III.    CONCLUSION

For the foregoing reasons no claims are dismissed or struck under Rules 12(f) or 9(b); Counts 6 and 7, any claims for injunctive relief, and any claims related to the "No Sweat" advertisements are dismissed under Rule 12(b)(1); and Counts 1 and 3 are dismissed pursuant to Rule 12(b)(6).

\*      \*      \*

For these reasons,

**IT IS** on this 19th day of November, 2025

**ORDERED** that Defendants' motion to dismiss (Docket Entry No. 54) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that, as to Counts I, III, VI, and VII, and the demands for injunctive relief, Defendants' motion to dismiss is **GRANTED**, and Counts I, III, VI, and VII, and the demands for injunctive relief are **DISMISSED** with prejudice; and

**ORDERED** that, as to Counts IV and V, Defendants' motion to dismiss is **GRANTED** and Counts IV and V are **DISMISSED** with prejudice to the extent the Counts are predicated on advertising which asserted that any bets placed would be done with "no sweat" but Defendants'

-23-

motion to dismiss is **DENIED** to the extent Counts IV and V are predicated on advertisements which asserted that any bets placed would be "risk-free" or at "no risk;" and

ORDERED that, as to Count II and the class allegations, Defendants' motion to dismiss is **DENIED**.


s/Stanley R. Chesler
STANLEY R. CHESLER, U.S.D.J.